2011 UT App 432

**Glade TERRY and Kairle Terry, Plaintiffs and Appellants,**

**v.**

**C. William BACON, M.D.; Central Utah Clinic, P.C.; and Utah Valley Regional Medical Center, Defendants and Appellees.**

**No. 20100893–CA.**

Court of Appeals of Utah.

Dec. 22, 2011.

James C. Haskins and Thomas N. Thompson, Salt Lake City, for Appellants.

R. Scott Williams and Briant S. Platt, Salt Lake City, for Appellees.

Before Judges DAVIS, McHUGH, and THORNE.

## OPINION

McHUGH, Associate Presiding Judge:

¶1 Glade and Kairle Terry (collectively, the Terrys) appeal the trial court's order enforcing a settlement agreement with Dr. C. William Bacon, Central Utah Clinic, and Utah Valley Regional Medical Center (collectively, defendants). The Terrys contend that the trial court's order was in error because they did not waive the attorney-client privilege, the oral settlement agreement was unenforceable, there was no meeting of the minds on the settlement, and the settlement amount paid to the Terrys shocks the conscience. We affirm.

## BACKGROUND

¶2 On September 26, 2007, the Terrys filed a complaint against defendants alleging that Dr. Bacon was negligent in performing surgery on Mr. Terry. Prior to surgery, Mr. Terry experienced sciatic nerve pain and other back and leg pain for which medical treatment, pain medications, and nerve block injections were inadequate. As a result, Dr. Bacon recommended the surgery that he performed on Mr. Terry in October 2005. After the surgery, Mr. Terry experienced significant buttocks and leg pain, and over time, he lost sensation and motion in his lower extremities. Mr. Terry consulted with Dr. John Braun, who determined that the surgery performed by Dr. Bacon was a possible cause of Mr. Terry's symptoms. Although a revision surgery was performed in December 2005, Mr. Terry continued to experience "permanent paralysis in his right lower extremities[,] for which he uses a brace for foot drop," and severe pain in his lower right extremities.

¶3 On October 24, 2007, defendants moved the court to compel arbitration pursuant to an arbitration agreement signed by Mr. Terry on June 7, 2005. The Terrys did not oppose this motion, and the parties stipulated that the proceedings be stayed pending arbitration. To the Terrys' knowledge, no arbitration proceedings were ever initiated.

¶4 On April 30, 2009, the trial court filed a Notice of Intent to Dismiss the case due to inactivity. The Terrys' counsel (former counsel) notified the trial court that the case was still active, but that he was withdrawing from the case and that the Terrys were seeking new counsel. After the Terrys' new counsel entered an appearance, defendants filed a Motion to Enforce Settlement Agreement and a Memorandum in Support. The memorandum alleged that a settlement agreement was reached between the Terrys and defendants in January 2009 but that the Terrys refused to sign the settlement documents. The motion was supported by an affidavit signed by defendants' counsel, stating that the parties had agreed to the amount of $15,000 "for the complete settlement and resolution of [the Terrys'] claims against [defendants]" and that former counsel promised that the Terrys "would sign and fully execute settlement documents dismissing with prejudice all of [the Terrys'] claims against [defendants]." Defendants' counsel

further stated that he sent a check to former counsel for $15,000, along with the settlement documents. However, the Terrys never cashed the check or signed the settlement documents, and in May 2009, former counsel reported "that his clients no longer wanted to settle and were seeking a second opinion." According to the affidavit, former counsel acknowledged that his clients were bound by the settlement agreement and had agreed to settle, but had "simply changed their mind[s]."

¶ 5 The Terrys opposed the Motion to Enforce Settlement Agreement, claiming that they "never at any time accepted the alleged settlement offer, and never would accept such an offer." The Terrys further asserted that they were "certain that [former counsel] would not have 'assured' [defendants' counsel] of [the Terrys'] acceptance of an offer, as [the Terrys] did not accept." An affidavit from Mr. Terry also stated, "I have never told anyone that I would accept $15,000 to settle my case against [defendants]," and "I have never agreed to settle my case for $15,000, nor would I ever settle for this amount." The Terrys also argued that there was no meeting of the minds between the parties and that evidence of their discussions with former counsel was inadmissible under the attorney-client privilege.

¶ 6 At a hearing on May 10, 2010, the trial court ruled that the Terrys had waived the attorney-client privilege by "raising th[e] issue of whether [former counsel] was authorized to enter into th[e] agreement." The trial court, however, limited former counsel's testimony to discussions about whether Mr. Terry authorized him to accept the settlement, ruling that it was unnecessary to delve into the conversations between the Terrys and former counsel regarding the relative strengths and weaknesses of the case.

¶ 7 Based on that evidentiary ruling, former counsel testified that Mr. Terry authorized him to accept the $15,000 settlement offer. While testifying, former counsel relied on notes he made at the time of the conversations with Mr. Terry. Next, Mrs. Terry testified about a telephone conversation between Mr. Terry and former counsel. She testified that she heard Mr. Terry's side of

the discussion and that he told former counsel that the offer "was not acceptable." However, Mrs. Terry admitted that she could not hear former counsel's side of the exchange and that Mr. Terry could have had further discussions with former counsel of which she was not aware. Finally, Mr. Terry testified, denying that he had ever authorized former counsel to accept the $15,000 settlement offer. According to Mr. Terry, when former counsel explained that the Terrys would net only $6,000 after attorney fees were paid, Mr. Terry replied, "I cannot do that, not with all my injuries."

¶ 8 After hearing the evidence, the trial court announced its ruling that the parties had entered into an enforceable settlement agreement. The court then memorialized that ruling in a written Order Enforcing Settlement Agreement on June 22, 2010. The trial court found that former counsel's testimony was credible and that it was corroborated by his notes, a telephone call to defendants' counsel, and a "contemporaneous remittal of a settlement check." The trial court also concluded that by "plac[ing] communications with their attorney 'at issue' in th[e] judicial proceeding," the Terrys had waived the attorney-client privilege. The Terrys now appeal.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 The Terrys first argue that the trial court erred in determining that the attorney-client privilege was waived, thereby allowing the Terrys' former counsel to testify against them. Whether a party has waived the attorney-client privilege is an issue of law, "which we review for correctness, giving no deference to the trial court's determination." *See Moler v. CW Mgmt. Corp.*, 2008 UT 46, ¶ 7, 190 P.3d 1250.

¶ 10 Second, the Terrys argue that the rule applied in *Reese v. Tingey Construction*, 2008 UT 7, 177 P.3d 605, which requires mediated settlements to be in writing before they can be enforced, *see id.* ¶¶ 12–14, should be extended to settlement agreements like the one in this case. Whether case law has been properly interpreted is an issue of law that we review for correctness. *See State v.*

*Stewart*, 2011 UT App 185, ¶ 6, 257 P.3d 1055 ("[W]e consider the trial court's interpretation of binding case law as presenting a question of law." (internal quotation marks omitted)).

 ¶ 11 Third, the Terrys argue that the trial court erred in enforcing the settlement agreement because there was not a meeting of the minds between the parties.

> Whether the parties had a meeting of the minds sufficient to create a binding contract is ... an issue of fact, which [w]e review ... for clear error, reversing only where the finding is against the clear weight of the evidence, or if we otherwise reach a firm conviction that a mistake has been made.

*LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 13, 221 P.3d 867 (citation and internal quotation marks omitted); *see also* Utah R. Civ. P. 52(a).

 ¶ 12 Finally, the Terrys argue that the trial court erred because the amount ultimately available to them from the settlement agreement "shocks the conscience." Whether a settlement agreement is so unfair that it shocks the conscience, which is generally a term used to describe substantive unconscionability of a contract, is a mixed question of fact and law. *See Woodhaven Apartments v. Washington*, 942 P.2d 918, 924 (Utah 1997). "A trial court's determination of the law is reviewed for correctness, while its findings of fact are reviewed for clear error." *Id.*

## ANALYSIS

I. The Trial Court Did Not Err When It Determined that the Terrys Waived the Attorney–Client Privilege Because the Terrys Placed Their Communications with Their Attorney at the Heart of the Case

 ¶ 13 The Terrys argue that the trial court erred by concluding that the Terrys waived the attorney-client privilege provided by rule 504 of the Utah Rules of Evidence by denying that they had agreed to the defendant's settlement offer. Specifically, the Terrys argue that it was defendants, not them, who placed their former attorney's conduct at issue. Although we do not base our decision on rule 504, we agree with the trial court that by contesting their consent to the settlement agreement, the Terrys put their former attorney's conduct at issue and waived the attorney-client privilege as to that question.

¶ 14 The attorney-client privilege has long been recognized as a mechanism "to encourage candor between attorney and client and [to] promote the best possible representation of the client." *See Doe v. Maret*, 1999 UT 74, ¶ 7, 984 P.2d 980, *overruled on other grounds by Munson v. Chamberlain*, 2007 UT 91, ¶¶ 20–21, 173 P.3d 848 (internal quotation marks omitted) (explaining that the attorney-client privilege "is the oldest of the common law privileges protecting confidential communications"). The privilege is recognized by both Utah Code section 78B–1–137(2) and rule 504(b) of the Utah Rules of Evidence. *See* Utah Code Ann. § 78B–1–137(2) (2008); Utah R. Evid 504(b). Rule 504(b) of the Utah Rules of Evidence provides "that [a] client has a privilege to refuse to disclose ... confidential communications made for the purpose of facilitating the rendition of professional legal services to the client between the client and the client's ... lawyers." *See* Utah R. Evid. 504(b); *see also* Utah Code Ann. § 78B–1–137(2) ("An attorney cannot, without the consent of the client, be examined as to any communication made by the client to the attorney or any advice given regarding the communication in the course of the professional employment."). Despite the existence of the privilege, rule 504(d) provides several instances where the privilege is inapplicable, and Utah courts have recognized that the privilege is waived in certain situations. *See* Utah R. Evid. 504(d); *State v. Johnson*, 2008 UT App 5, ¶ 20, 178 P.3d 915; *see also* Utah R. Evid. 507(a) (providing that the privilege may be waived if the holder "voluntarily discloses or consents to the disclosure" of privileged materials). Rule 504(d)(3) provides that the privilege does not apply "[a]s to a communication relevant to an issue of breach of duty by the lawyer to the client or by the client to the lawyer." *See* Utah R. Evid. 504(d)(3). The Terrys claim that they have not raised

an issue of breach of duty by former counsel and, therefore, the privilege is not waived. Because rule 504(d) is only one way in which the attorney-client privilege may be deemed inapplicable, we need not consider whether the Terrys have alleged that former counsel breached his professional duty.

¶ 15 In *Doe v. Maret*, 1999 UT 74, 984 P.2d 980, *overruled on other grounds by Munson v. Chamberlain*, 2007 UT 91, ¶¶ 20–21, 173 P.3d 848, the Utah Supreme Court recognized that "[a] party may also waive the privilege by placing attorney-client communications at the heart of a case, as where a party raises the defense of good faith reliance on advice of counsel." *Id.* ¶ 9. The Terrys claim that they did not authorize former counsel to enter into the settlement agreement, which directly placed communications between former counsel and the Terrys regarding the settlement offer at the heart of the case. Therefore, the Terrys waived the attorney-client privilege as to that issue. *See id.*

¶ 16 Generally, when a party places "privileged matters 'at issue' in the litigation" that party implicitly consents to disclosure of those matters.[1] *See Public Serv. Co. v. Lyons*, 2000–NMCA–077, ¶ 15, 129 N.M. 487, 10 P.3d 166. Communications between the attorney and client are "placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Rhone–Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir.1994). This is essentially a rule of fairness. *See Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir.2003); *see also Beery v. Thomson Consumer Elecs.*, 218 F.R.D. 599,

604 (S.D.Ohio 2003) ("An attorney-client communication is placed at issue when the party makes an assertion that in fairness requires examination of protected communications." (internal quotation marks omitted)). Although much of the case law discussing waiver of the privilege focuses on whether the attorney's *advice* to the client is at issue, even courts adopting the most conservative approach agree that waiver occurs "where direct use [of the privileged communication] is anticipated because the holder of the privilege must use the materials at some point in order to prevail." *See Lyons*, 2000–NMCA–077, ¶ 22, 129 N.M. 487, 10 P.3d 166; *see also Bittaker*, 331 F.3d at 719 ("[P]arties in litigation may not abuse the [attorney-client] privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials. The party asserting the claim is said to have implicitly waived the privilege."); *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y.1996) (acknowledging that while waiver often occurs when the advice of an attorney is at issue, the privilege extends to situations "when defendant asserts a claim that in fairness requires examination of protected communications" (internal quotation marks omitted)).

¶ 17 We agree with the jurisdictions holding that fairness dictates that "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield." *See, e.g., Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir.1992). In *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156 (9th Cir.1992), the defendant asserted as an affirmative defense that a tax position was reasonable based on the advice of coun-

---

1. There is some disagreement among courts regarding when a matter is placed "at issue" and is thus waived. Generally, courts adopt one of three approaches:

 The first of these general approaches is the "automatic waiver" rule, which provides that a litigant automatically waives the privilege upon assertion of a claim, counterclaim, or affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant. The second set of generalized approaches provides that the privilege is waived only when the material to be discovered is both relevant to the issues raised in the case and either vital or necessary to the opposing party's defense of the case. Finally, several courts have recently concluded that a litigant waives the attorney-client privilege if, and only if, the litigant directly puts the attorney's advice at issue in the litigation.

 *Frontier Refining, Inc. v. Gorman–Rupp Co., Inc.*, 136 F.3d 695, 699–700 (10th Cir.1998) (citations omitted). However, because we determine that the attorney-client privilege was waived in this case under the most restrictive approach, we need not decide when, as a threshold matter, a matter is placed "at issue."

sel. *See id.* at 1162. When the plaintiff sought to discover the attorney's advice, the defendant asserted the attorney-client privilege. *See id.* The trial court ruled that the privilege had been waived, and the Ninth Circuit agreed, explaining that "[the defendant] cannot invoke the attorney-client privilege to deny [the plaintiff] access to the very information that [the plaintiff] must refute in order to" succeed against the affirmative defense. *Id.* at 1162–63. However, even when a court determines that the privilege has been waived, courts should exercise caution to ensure that only communications relevant to the subject matter at issue are introduced. *See Bittaker,* 331 F.3d at 720 ("Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose."); *see also In re EchoStar Commc'ns Corp.,* 448 F.3d 1294, 1301 (Fed.Cir.2006) ("To prevent such abuses, we recognize that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter.").

¶ 18 Here, the trial court allowed former counsel to testify only as to the attorney-client communications directly related to whether the Terrys had instructed him to accept the $15,000 settlement offer. By cautioning former counsel to avoid any discussions about the merits of the Terrys' claims, the trial court carefully narrowed the intrusion into attorney-client discussions. In addition, even as identified by the Terrys, the heart of the matter is the substance of the communications between the Terrys and former counsel concerning the $15,000 settlement offer. Although the Terrys claim that they are not placing "their [former] attorney's conduct in issue," Mr. Terry asserts, "I have never told anyone that I would accept $15,000 to settle my case," and, "I have never agreed to settle my case for $15,000, nor would I ever settle for this amount." Likewise, the Terrys claim that they "never at any time accepted the alleged settlement offer, and never would accept such an offer" and that they "at no time entered into a settlement agreement or accepted $15,000 to settle their claims against [defendants]." By

the Terrys' own arguments, it is apparent that what they communicated to former counsel was at the center of their claim that the settlement agreement was unenforceable.

¶ 19 Moreover, the Terrys should not be permitted to use the privilege as a sword by relying on their statements about what was not said during the communications with former counsel, while also asserting the attorney-client privilege as a shield when the defendants attempt to refute those assertions. *See Chevron Corp.,* 974 F.2d at 1162–63. This case presents precisely the type of situation where the attorney-client privilege must be deemed waived to ensure fairness to both parties. *See id.* To hold otherwise would "deny [defendants] access to the very information that [defendants] must refute in order to" succeed against the Terrys' argument that the settlement agreement was not authorized. *See id.* at 1163. The trial court correctly determined that, by asserting the defense that they never authorized former counsel to accept the settlement offer, the Terrys waived the attorney-client privilege with respect to communications about that issue.

## II. The Terrys Did Not Preserve Their Argument that Settlement Agreements Should Not Be Enforced Unless They Are in Writing

¶ 20 The Terrys argue that we should extend the Utah Supreme Court's decision in *Reese v. Tingey Construction,* 2008 UT 7, 177 P.3d 605, to oral settlement agreements and require that such agreements be "reduced to a writing and signed" before they will be enforced by the courts. *See id.* ¶ 15. However, the Terrys do not provide a record citation directing the court to where they preserved this argument, *see* Utah R.App. P. 24(a)(5)(A), and our review of the record does not reveal that they raised it with the trial court. "In order to preserve an issue for appeal, the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.,* 2004 UT 72, ¶ 51, 99 P.3d 801 (internal quotation marks omitted). The purpose of this requirement is to put the trial court "on

notice of the asserted error and allow[ ] for correction at that time in the course of the proceeding." *Id.* "Issues that are not raised at trial are usually deemed waived," *id.*, "unless a defendant can demonstrate that exceptional circumstances exist or plain error occurred." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346 (internal quotation marks omitted). Because the Terrys did not raise this issue in the trial court and have not claimed either exceptional circumstances or plain error, we do not address the merits of this argument.

III. The Trial Court's Ruling that the Parties Reached a Meeting of the Minds with Regard to the Settlement Agreement Was Not Clearly Erroneous

¶ 21 The Terrys contend that the trial court committed clear error by ruling that the parties had a meeting of the minds to enter the settlement agreement. "Settlement agreements are governed by the rules applied to general contract actions." *Sackler v. Savin*, 897 P.2d 1217, 1220 (Utah 1995). Under general contract law, it is fundamental that there be a meeting of the minds as to all essential features of a contract. *See LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 14, 221 P.3d 867. Whether there is a meeting of the minds depends on whether the parties actually intended to contract, "and the question of intent generally is one to be determined by the trier of fact." *O'Hara v. Hall*, 628 P.2d 1289, 1291 (Utah 1981) (internal quotation marks omitted). Where there is a meeting of the minds as to the essential portions of the agreement and "the terms are sufficiently definite as to be capable of being enforced," a binding contract exists. *See LD III, LLC*, 2009 UT App 301, ¶ 14, 221 P.3d 867.

¶ 22 The Terrys claim that the trial court erred in concluding that there was a meeting of the minds because it was disputed (1) whether there was a valid settlement agreement, and (2) if there was a valid settlement agreement, whether it was for $15,000, which would have left the Terrys around $6,000 after attorney fees. Specifically, the Terrys contend that it was clear error to find a settlement agreement because the trial court "made no finding that any party was disin-genuous, lying, or acting in bad faith in relating their sworn recollections concerning settlement discussions." However, the trial court found that the Terrys agreed to accept the $15,000 offer, communicated that acceptance to former counsel, and authorized former counsel to enter into the settlement agreement. Because the trial court was in the best position to determine the credibility of the witnesses, we defer to its findings unless they are clearly erroneous. *See* Utah R. Civ. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."); *see also LD III, LLC*, 2009 UT App 301, ¶ 13, 221 P.3d 867.

¶ 23 Here, the trial court found "that the testimony of [former counsel was] credible and corroborated in part with notes that he used to record the substance of the conversations between Mr. Terry and [himself]." The court also found that the affidavit of defendants' counsel was particularly persuasive. That affidavit described a telephone call during which former counsel informed defendants' counsel that the Terrys were accepting the settlement agreement for $15,000; as a result, defendants' counsel delivered a settlement check to former counsel along with a Stipulation and Order of Dismissal of the case. Although the Terrys presented conflicting testimony regarding their acceptance of the agreement, the trial court found former counsel's testimony on that point more persuasive. The trial court was able to "assess the credibility of the witnesses and to gain a sense of the proceeding as a whole." *See Valcarce v. Fitzgerald*, 961 P.2d 305, 314 (Utah 1998). Where it permissibly weighed the testimony of each witness and the supporting documents, we will not second guess the trial court's determination that the Terrys authorized former counsel to accept the settlement offer. *See Jouflas v. Fox Television Stations, Inc.*, 927 P.2d 170, 174 (Utah 1996).

IV. The Terrys' Argument that the Settlement Agreement Shocks the Conscience Was Not Preserved

¶ 24 Finally, the Terrys contend that the amount actually paid to them under the

settlement agreement is so low that it "shocks the conscience."[2] However, the Terrys do not cite where in the record they preserved this argument, and our review of the record does not reveal that this argument was raised in the trial court.[3] Nor do the Terrys argue that lack of preservation should be excused due to plain error or exceptional circumstances. *See State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. Accordingly, this issue is waived and we do not address it further. *See id.*

## CONCLUSION

¶ 25 We conclude that the Terrys waived their attorney-client privilege when they directly placed the communications they had with their attorney at the heart of this dispute. We also hold that the trial court's credibility determinations regarding the existence of a settlement agreement were not clearly erroneous. Thus, we affirm the trial court's decision enforcing that agreement. The Terrys' claims that settlement agreements should not be enforced unless they are in writing and that the Terrys' ultimate recovery received from the settlement shocks the conscience were not preserved in the trial court, and we do not address them.

¶ 26 Affirmed.

¶ 27 WE CONCUR: JAMES Z. DAVIS, Presiding Judge, and WILLIAM A. THORNE JR., Judge.

---

2. On appeal, the Terrys claim that due to attorney liens and fees, they would receive only $64.58 from the settlement agreement. Under rule 1.5(a) of the Utah Rules of Professional Conduct, attorney fees must be reasonable in light of a number of factors. *See* Utah R. Prof'l Conduct 1.5(a). However, where the trial court found that the Terry's accepted the settlement, the reasonableness of the attorney fees is not properly challenged in this forum.

3. The Terrys' brief seems to acknowledge that this issue was never raised at the trial court, stating,

> Here, the parties have not addressed this issue because the trial court heard only the issue as to whether or not a settlement had been reached. The [Terrys] should be allowed to put on [their] evidence to show that the award is so inadequate as to shock the conscience of the court.