**2016 UT App 100**

## THE UTAH COURT OF APPEALS

REED BRASHER,
Appellant,
*v.*
VIKKI CHRISTENSEN,
Appellee.

Opinion
No. 20141183-CA
Filed May 12, 2016

Seventh District Court, Castle Dale Department
The Honorable George M. Harmond
No. 130700011

Justin D. Heideman and Justin R. Elswick, Attorneys
for Appellant

Don M. Torgerson and Mandie J. Torgerson,
Attorneys for Appellee

SENIOR JUDGE PAMELA T. GREENWOOD authored this Opinion, in
which JUDGES MICHELE M. CHRISTIANSEN and KATE A. TOOMEY
concurred.[1]

GREENWOOD, Senior Judge:

¶1     Reed Brasher appeals the order of the trial court
dismissing his complaint against Vikki Christensen for breach of
contract, breach of the covenant of good faith and fair dealing,
promissory estoppel, and declaratory relief. We affirm.

---

1. Senior Judge Pamela T. Greenwood sat by special assignment
as authorized by law. *See generally* Utah R. Jud. Admin. 11-
201(6).

BACKGROUND[2]

¶2    Vikki Christensen owns a 260-acre farm in Emery County, Utah, and rights to use irrigation water on that farm. Those water rights are represented by 780 shares of stock in the Huntington-Cleveland Irrigation Company (HCIC). Reed Brasher owns or leases approximately 100 acres of land in Emery County, where he raises cattle and grows alfalfa to feed the cattle. During the summer and fall, Brasher allows his cattle to graze on sixty acres of irrigated pasture; in the winter and spring, he feeds them from alfalfa stores gleaned from his thirty-acre alfalfa farm. Brasher, too, owns water stock in HCIC, but his shares are sufficient to irrigate only forty-five acres of his 100-acre farm. Thus, he must lease enough water to irrigate the remaining land to feed his twenty cattle and their calves.

¶3    On April 1, 2012, Brasher leased 215 class A water shares from Christensen. At that time, Brasher asked Christensen to lease him the water "until further notice." Christensen declined. Both parties signed a Water Use Authorization (WUA) form provided by HCIC and delivered it to HCIC, indicating the 2012 commencement of Brasher's water lease. Brasher checked the box next to "until further notice" on the 2012 WUA form. When HCIC contacted Christensen to verify that she wanted to lease Brasher her water "until further notice," she instructed HCIC that the lease was only for the 2012 season. Brasher's 2012 lease thus ended with the water year on October 31, 2012.

¶4    In February 2013, Brasher discovered that he could qualify for a subsidized federal program to install sprinkler irrigation on his farm through the National Resources

---

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Kidd v. Kidd*, 2014 UT App 26, ¶ 2 n.1, 321 P.3d 200 (citation and internal quotation marks omitted).

Conservation Service (NRCS) if he could establish he had long-term access to sufficient water shares. Brasher contacted Christensen to see if she would lease him water during the 2013 season. Christensen declined, stating that she was not sure the water would be available. Brasher called Christensen two more times, and Christensen declined both times. Then Brasher tried a fourth time, indicating an interest in purchasing Christensen's farm. He told her that he had $5,000 earnest money and persuaded Christensen to meet with him to discuss the details of his offer.

¶5     On March 13, 2013, Brasher, Christensen, and Christensen's friend, Nedra Swasey, met at Christensen's home. Prior to the meeting, Christensen told Swasey she would not lease the water shares to Brasher unless he purchased the farm. Brasher brought two forms with him: a blank WUA form and a blank Offer to Purchase Real Estate (Offer) form. Brasher and Christensen negotiated the terms of the Offer, Swasey filled in the Offer accordingly, and both parties signed it. The Offer allowed Brasher to take possession of the farm on March 25, 2013, but allowed Christensen to stay in the farmhouse through April 2, 2014. It also required Brasher to pay $5,000 earnest money, but Brasher did not pay the $5,000 at that time or at any subsequent time.

¶6     The parties also discussed the terms of the potential water shares lease. Brasher filled out the WUA, and both parties signed it. The pertinent language read, "In accordance with a lease and/or other agreement, I Vikki Christensen am authorizing Reed Brasher to call for: 215 shares of Class A Water from my [HCIC] water account starting at the beginning of 2013 irrigation season." Brasher left a $1,290 check for the water shares lease, which Christensen never cashed.

¶7     Christensen kept the Offer, and Brasher took the signed WUA with him to make copies for the parties, but he never returned a copy to Christensen. Instead, he delivered the WUA to HCIC that day in anticipation of the 2013 water season

beginning on April 1. When Brasher delivered the WUA to HCIC, the form stated that the water lease would continue until "the end of 2018 irrigation season" and that it was "payable 3/15 each year." At trial, Swasey testified, and the trial court found, that Brasher had added those terms after he left the meeting. The trial court also found that Christensen told Brasher that she needed to discuss the terms of both the Offer and the WUA with her family and attorney before proceeding further and that the water shares lease was contingent upon Brasher's purchase of the farm. Brasher countered that the water shares lease was independent from the farm purchase and that Christensen communicated that she needed to discuss only the Offer—not the WUA—with her attorney and family before accepting. Christensen argued that she understood the Offer and the WUA to be contingent upon each other, and Brasher argued that he understood the WUA to be independent of the Offer.

¶8    Between March 13 and March 24, Brasher called Christensen a number of times to determine if she accepted his Offer. He never reached her, and she never returned his call. Finally, the day before Brasher was supposed to take possession of the farm, Brasher and Christensen spoke. Brasher said at trial that he "believed at this time" that his Offer would not be accepted.

¶9    Believing that the water lease was independently executed, Brasher began drawing water in April. Subsequently, HCIC contacted Christensen to confirm that she wanted to lease Brasher the water through the 2018 water season. Christensen said she did not and instructed HCIC to stop providing water to Brasher. When Brasher found out his access to the water had been terminated, he allocated his own water shares to his alfalfa fields and sold all but four or five of his cows, because he could not water both the grazing pasture and the alfalfa field.

¶10    Brasher sought damages against Christensen for the loss of his alfalfa crop for the 2013 year and for losses related to his cattle operation extending over the purported life of the water

lease—five years—amounting to approximately $150,000 in damages. After a bench trial, the court dismissed Brasher's complaint against Christensen, determining that the WUA was not an enforceable contract but rather an instruction from one shareholder to HCIC to deliver water to another person, and that there was no meeting of the minds as to the terms of an oral contract between the parties to lease water.

¶11 Brasher appeals the decision of the trial court.

ISSUES AND STANDARDS OF REVIEW

¶12 Brasher first contends that the trial court erred when it determined that the 2013 WUA was not an enforceable contract. "A trial court's determination of the law is reviewed for correctness." *Terry v. Bacon*, 2011 UT App 432, ¶ 12, 269 P.3d 188 (citation and internal quotation marks omitted).

¶13 Brasher also contends that some of the trial court's findings of fact are not supported by the evidence and that the trial court clearly erred in determining that the parties did not have a "meeting of the minds."[3] These contentions present questions of fact, which we review for clear error. *Id.* ("[F]indings of fact are reviewed for clear error."); *LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 13, 221 P.3d 867 ("Whether the parties had a meeting of the minds sufficient to create a binding contract is . . . an issue of fact, which [w]e review . . . for clear error, reversing only where the finding is against the clear weight of the evidence, or if we otherwise reach a firm conviction that a mistake has been made." (alterations in original) (citations and internal quotation marks omitted)).

---

3. Brasher further claims the trial court erred by failing to apply the doctrine of promissory estoppel and the parol evidence rule. We do not reach those issues due to our decisions regarding the other issues presented.

ANALYSIS

I. The Trial Court Correctly Concluded That the 2013 WUA Was
Not an Enforceable Contract.

¶14    On appeal, Brasher contends that the trial court erred
when it concluded that the 2013 WUA was not an enforceable
contract. Christensen responds that the 2013 WUA is merely "a
form between a water owner and [HCIC] directing the company
to deliver water to a third-party lessee," that it contains
"virtually none of the required elements for contract formation,"
and that it "references a separate agreement between the water
owner and lessee that defines their relationship."

¶15    The WUA's title reads "Water Use Authorization." It
begins, "In accordance with a lease and/or other agreement, I
_____ am authorizing _____ to call for . . . ." It continues by
describing the number and type of HCIC water shares to be
leased, as well as the duration of the lease. The form omits any
reference to price or other consideration to be provided.

¶16    The trial court concluded

> 1. The WUA by itself does not establish an
> enforceable contract and it does not establish that
> [Christensen] accepted Brasher's offer to leas[e]
> water to Brasher, as a matter of law.
> 2. The WUA, [was] by its very terms, conditioned
> "[i]n accordance with a lease and/or agreement."
> 3. The WUA contemplates the parties have reached
> a separate agreement as to the lease of shares of
> HCIC stock, and the WUA instructs HCIC to
> deliver water to one of the parties for a period of
> time.

(Fourth alteration in original.)

¶17   The essential elements of an enforceable contract are (1) offer and acceptance, (2) consideration, and (3) competent parties. *Uhrhahn Constr. & Design, Inc. v. Hopkins*, 2008 UT App 41, ¶ 12, 179 P.3d 808 (citing *Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985).

¶18   We conclude that the trial court correctly determined that the 2013 WUA was not an enforceable contract. In particular, it seems clear that the terms of the form did not require offer and acceptance or consideration. The "WUA instructs HCIC to deliver water to one of the parties for a period of time," nothing more. And as the trial court held, the WUA "by its very terms" expressly conditions its enforceability upon "a lease and/or agreement," contemplating that the parties have reached a separate agreement as to the lease of HCIC stock. The terms of the form detail no offer by one party, no acceptance by another, and no consideration. The form is devoid of language establishing a contractual relationship between Brasher and Christensen. Consequently, the trial court correctly concluded that the 2013 WUA was not, by itself, an enforceable contract between Brasher and Christensen.

## II. The Trial Court Did Not Clearly Err When It Determined That There Was No Meeting of the Minds to Establish an Oral Contract.

¶19   Brasher claims the trial court "erred by entirely misstating Christensen's own testimony." He also claims the trial court "ignored the clear weight of evidence and every factual *indicia* proving that Christensen agreed to lease the water to Brasher under the terms of the 2013 WUA." Christensen responds that "it was apparent to the trial court that the 2013 WUA and the [Offer] were interrelated and dependent on each other as a package deal."

¶20   Having concluded that the 2013 WUA did not establish an enforceable contract between Brasher and Christensen, the trial court recognized that "[w]hether an oral contract was

established [between the parties] turns upon whether there was a meeting of the minds as to each element of the contract" and that Brasher had the "burden to prove the existence of an oral contract." The trial court found, "based on the evidence presented at trial, that Christensen believed the water lease was part of the Farm sale and that there was no meeting of the minds between the parties." Thus, it concluded that "Christensen did not intend to lease the water to Brasher unless he purchased the farm and there was no contract between the parties."

¶21 "[A] binding contract exists where it can be shown that [the] parties had a meeting of the minds as to the integral features of the agreement and that the terms are sufficiently definite as to be capable of being enforced." *LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 14, 221 P.3d 867 (second alteration in original) (citation and internal quotation marks omitted). "Whether there is a meeting of the minds depends on whether the parties actually intended to contract, and the question of intent generally is one to be determined by the trier of fact." *Terry v. Bacon*, 2011 UT App 432, ¶ 21, 269 P.3d 188 (citation and internal quotation marks omitted). We review this issue "for clear error, reversing only where the finding is against the clear weight of the evidence, or if we otherwise reach a firm conviction that a mistake has been made." *LD III, LLC*, 2009 UT App 301, ¶ 13 (citation and internal quotation marks omitted).

¶22 Brasher testified that he believed he could draw water regardless of Christensen's acceptance of his offer to purchase the farm, whereas Christensen testified multiple times that she intended the water lease to be contingent upon the sale of the farm. For example, Christensen testified, "If . . . I sold [the farm] to him, then I'd rent him that water for a few years." She also testified that she authorized Brasher to use her water "only because he was going to buy the place." And she also stated that "he was only to use the water if he bought the farm." Swasey bolstered that testimony, stating that Christensen told her that she would not lease Brasher the water unless he bought the farm.

¶23    Brasher also contends that the trial court clearly erred when it found that Christensen told Brasher she needed to discuss the terms of the WUA with her family and attorney. He argues that "all testimony and evidence in the record demonstrates that Christensen only ever discussed taking the [Offer] to her attorney and family," not the WUA. Christensen, however, cites a number of instances where her testimony at trial supports the trial court's finding that she "informed Brasher that she needed to discuss both [the Offer and the WUA] with her family and with her attorney before anything was final."

¶24    We review a trial court's finding of fact for clear error. *Terry*, 2011 UT App 432, ¶ 12. Furthermore, "a party challenging a factual finding . . . will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal" the evidence. *State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645. In marshaling the evidence, it is an appellant's burden to "establish[] a basis for overcoming the healthy dose of deference owed to factual findings." *Id*. ¶ 41. A trial court assessing whether evidence establishes a meeting of the minds will inevitably find itself in the position of weighing witness credibility. And "[a]ssessing the credibility of a witness is within the trial court's domain." *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 16, 288 P.3d 1046.

¶25    Brasher's opening brief fails to cite a single instance—of the many—where Christensen or Swasey testified in support of the trial court's finding. Although, as conceded in Christensen's brief, Christensen's testimony may not have been "a model of clarity," it was sufficient, with other evidence, to support the trial court's findings. For example, Christensen testified that

> [Brasher] wasn't supposed to [call on the water] until I got back with my attorney to see whether I was going to sell it or not. If . . . I sold it to him, then I'd rent him that water for a few years. If my attorney and my family didn't think it was right, then I wouldn't.

Christensen also testified that Brasher "was only to use the water if he bought the farm." She further testified, "he was supposed to just hang on until I got . . . everything done before I said yes, . . . [a]nd before I [did] that, he started using water." And the following exchange between Christensen and her attorney at trial elicited further support:

> A (Christensen): None of it was supposed to be legal.
> Q (Her attorney): What do you mean by that? . . .
> A: Yeah, that it was not—I was going to you and a few people to see if it was. And that's what I told him. I won't—none of this is good here today.
> Q: Including [the 2013 WUA]? . . .
> A: Yeah, . . . .
> Q: Did you think you were leasing him any water by itself?
> A: No.

And Swasey testified that the 2013 WUA and the Offer to Purchase "were separate agreements, but they were contingent on each other."[4]

¶26　We therefore conclude that the trial court's finding was supported by evidence and that the court did not clearly err when it found that Christensen told Brasher she needed to discuss the terms of the WUA and the Offer with her family and attorney "before anything was final." We further conclude that because Brasher testified that he believed the two agreements

---

4. Brasher also disputes the trial court's finding that he filled in the blanks "2018" and "payable 3/15 each year" on the 2013 WUA after meeting with Christensen and before delivering the WUA to HCIC. Our determination that there was no meeting of the minds sufficient to establish an oral contract renders in-depth analysis of this question unnecessary.

were independent of each other and Christensen testified to the contrary—that she intended them to be contingent upon each other—the trial court did not err when it concluded there was no meeting of the minds sufficient to create an oral contract.

CONCLUSION

¶27    The trial court correctly determined that the WUA was not an enforceable contract and that there was no meeting of the minds as to the 2013 WUA. Accordingly, we affirm.

————