2025 UT App 74

## THE UTAH COURT OF APPEALS

CO-DIAGNOSTICS INC.,
Appellee,
*v.*
HUKUI TECHNOLOGY INC., HUKUI TECH INC.,
AND HUKUI BIO CO. LTD.,
Appellants.

Opinion
No. 20231131-CA
Filed May 22, 2025

Third District Court, Salt Lake Department
The Honorable Adam T. Mow
No. 210902131

John D. van Loben Sels, Heidi G. Goebel, and
Amberly Page, Attorneys for Appellants

Mark O. Morris and Benjamin J. Mills,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

HARRIS, Judge:

¶1      HuKui Technology Inc., HuKui Tech Inc., and HuKui Bio
Co. Ltd. (collectively, HuKui) filed counterclaims against Co-
Diagnostics Inc. (CoDx), asserting chiefly that CoDx had breached
a binding contract and intentionally interfered with its economic
relations, but raising alternative claims of promissory estoppel
and unjust enrichment. The district court dismissed all of HuKui's
claims on summary judgment, and HuKui appeals. We affirm the
dismissal of HuKui's claim for intentional interference with
economic relations, but we conclude that the existence of genuine
issues of material fact precludes dismissal, at this procedural
stage, of HuKui's remaining claims, and on that basis we reverse

the district court's order dismissing those claims and remand the case for further proceedings.

BACKGROUND[1]

¶2    HuKui provides "total solution and value-added services to global medical devices customers" and claims to have a "competitive edge" related to its "ability [to] shorten the time to market for product sales." CoDx is a company that "is in the business of producing a variety of medical devices, including certain COVID-19 test kits." Although some of their respective board members were apparently acquainted, the two companies had never done business together prior to 2020.

¶3    In early 2020, during the emergence of the COVID-19 pandemic, CoDx and HuKui began to discuss ways in which they might work together to market CoDx's test kits, and on March 1, 2020, CoDx issued signed "Letters of Authorization" that authorized HuKui to "sell and distribute" CoDx's kits. Under this arrangement, CoDx would sell the kits to HuKui at a price of $6 per unit, and HuKui would be free to then re-sell the kits to third parties for whatever price it could negotiate.

¶4    After obtaining authorization from CoDx, HuKui began attempts to market CoDx's kits, and it believed that, under the terms of the parties' arrangement, it could sell the kits to anyone, regardless of whether the buyer was an end user of the product or was merely another distributor who would, in turn, re-sell the kits. Indeed, the Letters of Authorization themselves contained no

---

1. When reviewing a district court's order granting summary judgment, we "recite the facts in the light most favorable to the non-moving party." *Burton v. Chen*, 2023 UT 14, ¶ 5 n.2, 532 P.3d 1005 (cleaned up). Accordingly, we recite the facts in this opinion in the light most favorable to HuKui, recognizing that many of the facts recited here are contested by CoDx.

limits on the identity of persons or entities to whom HuKui was authorized to market the kits. Many (if not all) of HuKui's customers were apparently other distributors, and some of them inquired—apparently due to pandemic-related urgency involving getting the kits to the ultimate users as fast as possible— about whether they could just buy the kits directly from CoDx and thereby obtain them faster.

¶5    To discuss this and other issues, the parties held a conference call on March 23, 2020. According to minutes of the meeting taken by another of CoDx's authorized distributors, CoDx indicated that it could "accommodate" having orders placed directly with CoDx "if the order size/model make sense," and it stated that, if such orders were placed by a distributor's clients, the clients could "pay to [CoDx] at Distributor's price" and then CoDx would "remit[] commission back to Distributors." When asked what price should be "quote[d]" to customers who wanted to order from CoDx directly, CoDx stated that the distributors should "quote $7/kit to wholesale." The question was then raised as to how CoDx would "protect[] the [d]istributors" by not allowing "customers [to] directly cut the [d]istribution chain," and one of the distributors suggested that it could provide CoDx with "a customer list" so that CoDx could "recognize" which customers were referred by which distributor. CoDx responded that it could "do that to affirm and . . . recognize" the distributors' customers, and it stated that it would "do [its] best" to protect HuKui and similarly situated distributors.

¶6    A few weeks after this meeting, HuKui entered into a "Customer Referral Agreement" with another distribution company (Sub-Distributor). The agreement specified that "HuKui will provide" CoDx's COVID-19 test kits to Sub-Distributor for a "flat fee of" $8 per kit, and then Sub-Distributor would be free to re-sell the kits to end users for whatever price it could negotiate.

¶7      CoDx later got wind of HuKui's arrangement with Sub-Distributor, and it objected, offering its view that, under the terms of the contract exemplified by the Letters of Authorization, HuKui was authorized to sell the kits only to end users and not to "sub-distributors" who would themselves sell to end users; CoDx claimed that doing so would violate an internal policy—aimed at preserving "product traceability"—against the use of more than one level of distributors. CoDx apparently also believed, at least for a time, that federal regulations prohibited the sale of its test kits to sub-distributors, although CoDx later acknowledged that this belief was mistaken and that no such regulation existed. HuKui denied that CoDx had previously informed it of any such policy or regulation, and it contested any assertion that the Letters of Authorization prohibited sales of the kits to sub-distributors. In any event, CoDx informed HuKui that any sales by HuKui to Sub-Distributor would place HuKui "in violation of [the] agreement" between the two companies. But CoDx also stated that "the way to fix" the problem was for HuKui's sub-distributors to "order from [CoDx] directly and [CoDx] will figure out a way to compensate [HuKui] for making the connection." CoDx reiterated that it would "do everything in [its] power to protect" HuKui in that situation, and it represented that if CoDx became aware "that a client [had] been brought by a distributor and the client attempts to go around the distributor," it would "refuse to sell to the client unless they work[ed] through the distributor."

¶8      Based on these representations, as well as the agreement it thought had been reached regarding these issues during the March 23 meeting, HuKui passed along to CoDx the contact information for Sub-Distributor so that Sub-Distributor could order test kits directly from CoDx. HuKui believed that it would receive a commission—or some other type of compensation—for establishing the connection between Sub-Distributor and CoDx.

¶9      A few weeks after that, however, CoDx terminated its business relationship with HuKui, telling HuKui that it was "to

no longer represent" CoDx. In the termination email, CoDx explained that HuKui had "represented [itself] as a distributor" but that it was actually just a "middle man" whose contacts were all sub-distributors rather than end users.

¶10    Even after this email, HuKui continued to try to smooth things over with CoDx, stating in a follow-up email that—after speaking with Sub-Distributor—it "believe[d that the] three of [them had] an understanding of cooperation." A few days later, HuKui sent a draft written contract to CoDx for review and signature; under the terms of that agreement, CoDx would "pay a commission to" HuKui for test kits it sold to clients—including Sub-Distributor—that were "referred by [HuKui] to [CoDx]." This draft agreement, however, was never executed.

¶11    Meanwhile, CoDx and Sub-Distributor proceeded with their relationship, and over the course of the next several months, Sub-Distributor ordered and purchased a large number of test kits from CoDx. HuKui believes that, over the course of their relationship, Sub-Distributor purchased some 750,000 kits from CoDx. Furthermore, CoDx admits that its "gross profit" from sales to Sub-Distributor "was $4.50 to $5 per test" kit.

¶12    Eventually, HuKui sent CoDx a demand letter, asserting that the parties had reached an agreement whereunder CoDx would "remit commission of $1.00 per [test kit] back to HuKui" and that CoDx had breached that agreement, causing HuKui to sustain "monetary damage in the amount of at least $750,000.00."

¶13    CoDx refused to pay HuKui's demand, and it instead sued HuKui, seeking a judicial declaration that CoDx "has no ongoing contractual or other relationship with" HuKui and that HuKui has no "interest right, title or claim to monies or sales proceeds paid to" CoDx "by third parties." HuKui answered the complaint and filed counterclaims for breach of contract, promissory estoppel, unjust enrichment, and intentional interference with economic relations. It alleged that there existed "valid, vested, and binding

contracts" between HuKui and CoDx regarding sale and distribution of the test kits and that CoDx had breached those agreements. It also alleged that CoDx had intentionally interfered, by improper means, with its economic relationship with Sub-Distributor. And in the alternative, HuKui asserted that it had provided a benefit to CoDx by introducing it to Sub-Distributor and that CoDx would be unjustly enriched if it were not required to compensate HuKui for making that connection.

¶14 After discovery, CoDx moved for summary judgment, arguing that all of HuKui's counterclaims "lack necessary evidence and are not viable as a matter of law." With regard to the claim for breach of contract, CoDx asserted that "there is no enforceable contract" between CoDx and HuKui for referral commissions. As for the promissory estoppel claim, CoDx claimed that it had made no definite promise to HuKui. With regard to unjust enrichment, CoDx asserted that HuKui could not provide sufficient evidence of damages. And finally, CoDx argued that HuKui could not show that it had acted with the improper means necessary to support a claim for intentional interference with economic relations. HuKui opposed the motion, asserting that genuine issues of material fact existed with regard to each of its claims and that they were not subject to dismissal on summary judgment.

¶15 After full briefing and oral argument, the district court issued a written ruling granting CoDx's motion and dismissing all of HuKui's claims. The court concluded that the record lacked "evidence that the parties ever agreed upon the material terms of" any agreement, including "price and method of performance," and it concluded that there was therefore "no contract." In that same vein, it determined that the "alleged promises" made by CoDx were "too vague" to be enforceable, either as a contract or under the doctrine of promissory estoppel. With regard to unjust enrichment, the court concluded that "HuKui ha[d] failed to present evidence rising above mere speculation regarding the

amount CoDx ha[d] been unjustly enriched." Finally, the court determined that HuKui had "failed to present evidence regarding improper means" on its intentional interference claim.

## ISSUE AND STANDARD OF REVIEW

¶16 HuKui now appeals, and it challenges the order dismissing its claims on summary judgment. "We review a district court's grant of summary judgment for correctness." *Fine v. University of Utah School of Med.*, 2024 UT 4, ¶ 12, 545 P.3d 215 (cleaned up). "Summary judgment is appropriate only when, viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id.* (cleaned up); *see also* Utah R. Civ. P. 56(a) ("The court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.").

## ANALYSIS

¶17 The district court granted summary judgment in CoDx's favor on all four of HuKui's counterclaims, and HuKui challenges that determination. We discuss each claim, in turn, and conclude that the district court correctly dismissed the claim for intentional interference with economic relations. But we agree with HuKui that the court should not have dismissed the other claims at this procedural stage.

### I. Breach of Contract

¶18 We first address HuKui's challenge to the district court's dismissal of its claim for breach of contract. As noted, the court dismissed that claim because it believed HuKui had "not presented evidence that the parties ever agreed upon the material

terms" of the purported contract, including "price and method of performance." HuKui takes issue with that conclusion, and it asserts that the record contains evidence that could support a factfinder's conclusion that a contract exists between the parties and that CoDx breached it. We agree with HuKui that genuine issues of material fact remain to be decided on these questions.

¶19 To succeed on a breach of contract claim, the party asserting the breach (here, HuKui) must show the existence of "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bear v. LifeMap Assurance Co.*, 2021 UT App 129, ¶ 16, 503 P.3d 507 (cleaned up). To meet the first requirement—the existence of a contract—HuKui must present evidence of the basic elements of a contract, namely, offer, acceptance, and consideration. *See Rossi v. University of Utah*, 2021 UT 43, ¶ 31, 496 P.3d 105 ("An enforceable contract thus consists of the terms of a bargained-for exchange between the parties. And the terms of the bargain are defined by the meeting of the minds of the parties—through an offer and acceptance upon consideration."); *see also Brasher v. Christensen*, 2016 UT App 100, ¶ 17, 374 P.3d 40 (stating that "[t]he essential elements of an enforceable contract" include "(1) offer and acceptance [and] (2) consideration").

¶20 The point of dispute here is whether enough evidence exists in the record to potentially support a factfinder's reasonable conclusion that a contract exists between these parties, the terms of which CoDx could have breached. The parties agree that a contract existed between them: the Letters of Authorization created a contractual relationship between them and allowed HuKui to purchase test kits from CoDx for $6 per unit and re-sell them. But HuKui does not assert that CoDx breached the terms of the Letters of Authorization. Instead, HuKui asserts that CoDx breached contractual terms that it believes the parties added to their arrangement later, during the March 23 meeting and thereafter, when the parties discussed the scenario in which

HuKui's contacts would purchase test kits directly from CoDx. As HuKui sees it, the parties reached a meeting of the minds on the essential terms of a modified contract at that meeting, where they agreed that if HuKui's contacts purchased test kits directly from CoDx, HuKui would receive a commission of at least $1 per kit from those sales. *See Arlington Mgmt. Assocs., Inc. v. Urology Clinic of Utah Valley, LLC*, 2021 UT App 72, ¶ 17, 496 P.3d 719 ("It is well-settled law that the parties to a contract may, by mutual consent, alter all or *any portion* of that contract by agreeing upon a modification thereof." (cleaned up)); *see also id.* ("The modified terms govern the rights and obligations of the parties under the contract, and any pre-modification contractual rights which conflict with the terms of the contract as modified must be deemed waived or excused." (cleaned up)). And HuKui asserts that CoDx breached the terms of this agreement by selling some 750,000 test kits to Sub-Distributor—after HuKui had introduced Sub-Distributor to CoDx—without compensating HuKui at all.

¶21 Thus, the relevant question is whether genuine issues of material fact remain to be decided about whether the parties entered into enforceable contractual terms on March 23 or thereafter, or whether the evidence in the record on that point is so scant as to warrant dismissal of HuKui's contract claim as a matter of law. And in this vein, we note that "whether there is a meeting of the minds depends on whether the parties actually intended to contract, and the question of intent generally is one to be determined by the trier of fact." *Terry v. Bacon*, 2011 UT App 432, ¶ 21, 269 P.3d 188 (cleaned up). After examining the record submitted to us, we agree with HuKui that evidence exists from which a reasonable factfinder could determine that the parties entered into a commission contract at the March 23 meeting.

¶22 The best evidence supporting HuKui's position is the written minutes from that meeting. We acknowledge that CoDx disputes the accuracy of those minutes. And we also acknowledge that those minutes are at times ambiguous as to what was said

and what was meant. But for purposes of assessing the propriety of the court's summary judgment order, we are obligated to assume that the minutes are accurate, and we are obligated to construe those minutes in the light most favorable to HuKui, the summary-judgment nonmovant. *See Fine v. University of Utah School of Med.*, 2024 UT 4, ¶ 12, 545 P.3d 215. Viewed with these principles in mind, the meeting minutes constitute evidence sufficiently supportive of HuKui's position to render summary judgment on the contract claim improper.

¶23   The minutes indicate that CoDx told the distributors present at the meeting (including HuKui) that their "clients can PO and pay to CoDx at Distributor's price, then CoDx remits commission back to Distributors." One plausible interpretation of this sentence is that CoDx agreed that HuKui's clients, including Sub-Distributor, could order test kits through a purchase order (a "PO") directly from CoDx, and that if that happened, a "commission" would be remitted to HuKui. Further discussion ensued about how CoDx would "recognize" whether a customer making an order was a HuKui client or not; another distributor suggested that authorized distributors could "provide a customer list" to CoDx, and CoDx apparently agreed to that procedure.

¶24   With regard to the price term (or, stated another way, the amount of the commission), the meeting minutes are somewhat less clear. But HuKui suggests an interpretation of the minutes that contains a definite price term, and in our view that interpretation is not unreasonable, especially given our obligation to construe the evidence in the light most favorable to HuKui. The minutes indicate that CoDx instructed the distributors to "quote $7/kit to wholesale" customers. The minutes also discuss using the "Distributor's price" as part of the calculation, which the parties agree was $6 per unit as per the Letters of Authorization. Thus, HuKui maintains that the parties agreed that "wholesale" clients of HuKui, such as Sub-Distributor, could purchase test kits directly from CoDx and that in doing so they would pay CoDx a

given price ($7 per kit was suggested) from which CoDx would keep $6 (the "Distributor's price") and remit the difference to HuKui. Again, while we acknowledge that certain inferences must be drawn from the language used in the meeting minutes in order to reach this conclusion, we do not view that conclusion as unreasonable. Stated another way, a factfinder could reasonably reach that conclusion based on the currently available evidence.

¶25   For these reasons, we disagree with the district court's statement that there is no evidence of an agreement on material terms such as "price and method of performance." To be sure, the evidence supporting HuKui's position is hotly contested and subject to various interpretations. But those contests are properly reserved for the factfinder. At this procedural stage, HuKui's claim for breach of a commission contract is not subject to dismissal, because genuine issues of material fact remain to be decided on that claim.

## II.  Promissory Estoppel

¶26   HuKui next challenges the district court's dismissal of its alternatively pled promissory estoppel claim, asserting that the court "incorrectly concluded that no reasonable finder of fact" could determine that CoDx had made a definite promise upon which HuKui had relied. On this point, as with the contract claim, we agree with HuKui that there are genuine issues of material fact that preclude summary judgment.

¶27   "A party claiming promissory estoppel must establish the following: (1) a promise reasonably expected to induce reliance; (2) reasonable reliance inducing action or forbearance on the part of the promisee or a third person; and (3) detriment to the promisee or third person." *Cottonwood Improvement Dist. v. Qwest Corp.*, 2013 UT App 24, ¶ 3, 296 P.3d 754 (cleaned up). "Reasonable reliance is generally a factual matter, within the province of the finder of fact." *Anderson v. Larry H. Miller Commc'ns Corp.*, 2012 UT App 196, ¶ 20, 284 P.3d 674 (cleaned up).

¶28   Here, too, we determine that the presence of factual disputes precludes summary judgment. Specifically, there exist facts sufficient to permit a reasonable factfinder to conclude that CoDx made a promise upon which HuKui detrimentally relied. *See Cottonwood*, 2013 UT App 24, ¶ 3. For one, our analysis here is substantively similar to our analysis on HuKui's breach of contract claim. *See supra* Part I. Once again, when drawing all reasonable inferences in favor of HuKui, the March 23 meeting minutes show that CoDx did indeed promise that, if HuKui's customers ordered test kits directly from CoDx, then CoDx would "remit[] commission back to" HuKui.

¶29   Furthermore, there are sufficient facts from which a reasonable factfinder could determine that HuKui detrimentally relied on CoDx's apparent promise. In particular, a few weeks after the March 23 meeting, HuKui connected CoDx and Sub-Distributor for the purpose of facilitating sales between them.

¶30   Based on this, there remain disputes of material fact regarding whether CoDx made a definite promise upon which HuKui reasonably relied to its detriment, and the district court thus erred in granting summary judgment in favor of CoDx on HuKui's alternatively pled promissory estoppel claim.

### III.  Unjust Enrichment

¶31   Next, HuKui challenges the district court's dismissal of its alternatively pled unjust enrichment claim. In particular, HuKui takes issue with the court's conclusion that HuKui "failed to present evidence rising above mere speculation regarding the amount CoDx has been unjustly enriched."

¶32   "Unjust enrichment is designed to provide an equitable remedy where one does not exist at law." *AGTC Inc. v. CoBon Energy LLC*, 2019 UT App 124, ¶ 19, 447 P.3d 123 (cleaned up). "To recover on a claim for unjust enrichment, the plaintiff must establish three elements: (1) The defendant received a benefit;

(2) an appreciation or knowledge by the defendant of the benefit; (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." *S6, LLC v. Wing Enters., Inc.*, 2024 UT App 105, ¶ 34, 556 P.3d 100 (cleaned up). Typically, the "measure of recovery for an unjust enrichment claim is the value of the benefit conferred on the defendant (the defendant's gain) and not the detriment incurred by the plaintiff." *Id.* (cleaned up).

¶33 We agree with HuKui that there exists sufficient evidence to create a genuine dispute of material fact regarding the value of the benefit that HuKui conferred upon CoDx when it introduced CoDx to Sub-Distributor. In this case, there are at least two methods by which a factfinder could calculate the benefit conferred on CoDx: (1) the amount of commission not paid to HuKui on sales CoDx made to Sub-Distributor, or (2) profits CoDx realized as a result of HuKui's referral.

¶34 With regard to the first method, a factfinder could reasonably determine—for the reasons already discussed—that CoDx received a benefit of at least $1 per test kit sold to Sub-Distributor when it did not pay HuKui a commission in that amount as allegedly agreed upon. *See supra* ¶ 24. As already noted, while that calculation depends on inferences and interpretations in HuKui's favor, we disagree with the district court's conclusion that it is merely speculative.

¶35 With regard to the second method, CoDx admits that, for each test kit sold to Sub-Distributor, it realized a "gross profit" between $4.50 and $5 per kit. And the record contains some indication of how many kits CoDx sold to Sub-Distributor. Exactly what CoDx's witness meant by "gross profit" is unclear from the record submitted to us. But again, all inferences are to be drawn in HuKui's favor at this point, and based on that statement a jury could reasonably conclude, without engaging in undue speculation, that CoDx realized $4.50 per kit in profit.

¶36    Accordingly, summary judgment on HuKui's alternatively pled unjust enrichment claim was inappropriate.

## IV.  Intentional Interference with Economic Relations

¶37    Finally, HuKui takes issue with the district court's dismissal of its claim for intentional interference with economic relations. We discern no error in the court's order granting summary judgment in CoDx's favor on this claim.

¶38    To succeed on a claim for intentional interference with economic relations, the plaintiff must prove "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *England Logistics, Inc. v. Kelle's Transport Service, LLC*, 2024 UT App 137, ¶ 40, 559 P.3d 45 (cleaned up). Here, the district court determined that HuKui's claim was infirm on the second element, concluding that "HuKui has failed to present evidence regarding improper means."

¶39    "Our supreme court has defined improper means narrowly." *Id.* ¶ 41 (cleaned up). As defined, "this term includes only those actions that are (1) contrary to law, such as violations of statutes, regulations, or recognized common-law rules, or (2) actions that violate an established standard of a trade or profession." *Id.* (cleaned up). We agree with the district court that HuKui has not demonstrated that CoDx's methods fall into either of these categories.

¶40    For starters, HuKui does not assert that CoDx's actions violated any "established standard of a trade or profession." *Id.* (cleaned up). So the second category is not applicable here. But HuKui does allege that CoDx's actions fall into the first category; it asserts that CoDx used "deceit or misrepresentation," in violation of common-law rules, in an effort "to interfere with HuKui's relationship with" Sub-Distributor.

¶41    We note that "our supreme court has been careful to limit the scope of this category to independently tortious or wrongful acts." *Id.* ¶ 42 (cleaned up). In other words, "a person is not liable for intentional interference where the person engaged only in conduct in which he or she was legally entitled to engage." *Id.* (cleaned up). Actions taken in the commercial context that may constitute sharp practices but are not independently tortious do not qualify as "improper means." *Id.* ¶¶ 42–46 (stating that "misrepresentations of law and opinions about the legal effect of contracts are not adequate bases for actionable fraud" and therefore do not constitute improper means (cleaned up)); *see also C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 41, 437 P.3d 343 (stating that, "in the rough and tumble of the marketplace, competitors inevitably damage one another in the struggle for personal advantage," but that "the law offers no remedy for those damages—even if intentional—because they are an inevitable byproduct of competition" (cleaned up)).

¶42    Thus, in order to demonstrate that CoDx committed the sort of "deceit or misrepresentation" that might qualify as "improper means" for purposes of the intentional interference tort, HuKui must show that CoDx committed an act that was either illegal or constituted an actionable tort (for instance, one sounding in fraud). *England Logistics*, 2024 UT App 137, ¶ 43 (stating that acts serious enough to "satisfy the improper means element" are "illegal or tortious in themselves" (cleaned up)). In an effort to make this showing, HuKui relies on two assertions that CoDx made: CoDx's statement about FDA regulations preventing CoDx's use of sub-distributors, and CoDx's "represent[ation] that [it] would compensate HuKui if [HuKui] put CoDx in contact with [its] clients." Neither of these assertions rise to the level of improper means.

¶43    First, CoDx's assertion that federal regulations prohibited it from selling test kits to sub-distributors, although apparently inaccurate, does not amount to improper means. Even if we

assume, for purposes of our analysis, that CoDx made this false assertion knowingly, "misrepresentations of the law" do not generally amount to improper means. *Id.* ¶ 46 (cleaned up). And, at any rate, the record indicates that CoDx apparently did have an internal policy against the use of sub-distributors. The fact that such a policy may have been based on a misunderstanding of the law is, for present purposes, a fact of no consequence.

¶44 Second, CoDx's assurances that it would "compensate" HuKui if HuKui "put CoDx in contact with [its] clients" are nothing more—and nothing less—than the terms of the alleged contract between HuKui and CoDx. In its brief, HuKui makes no effort to demonstrate that this alleged breach of contract was illegal or independently tortious. In particular, HuKui makes no effort to identify an established tort that this particular representation violated, much less explain how all the elements of such a tort would be met here.[2]

---

2. Moreover, even if HuKui could identify a tort whose elements might technically be satisfied by a breach of this kind of representation, we wonder how HuKui could obtain recovery in tort under these circumstances. *See KTM Health Care Inc. v. SG Nursing Home LLC*, 2018 UT App 152, ¶¶ 76–78, 436 P.3d 151 (stating that tort claims "are barred by the economic loss rule if those claims are grounded in the same duties that exist by virtue of the parties' contract," and holding that tort claims based on the opposing party's representations that it would "comply and perform in accordance with the terms of the parties' contract" were not actionable (cleaned up)); *see also HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶ 23, 435 P.3d 193 (concluding that "the economic loss rule applies to fraudulent inducement claims that overlap completely with a breach of contract claim"). But because the parties have not briefed this issue, and because HuKui does not make the required foundational showing in any event, we do not further discuss this issue.

¶45 The district court therefore correctly determined that HuKui had not pointed to sufficient evidence of improper means to survive summary judgment on its intentional interference claim. Accordingly, we affirm the court's dismissal of that claim on summary judgment.

## CONCLUSION

¶46 We affirm the district court's order dismissing HuKui's claim for intentional interference with economic relations. But because genuine issues of material fact remain to be decided on HuKui's other claims, we reverse the court's order dismissing those claims and remand this case to the district court for further proceedings.

———————