**2024 UT App 105**

## THE UTAH COURT OF APPEALS

S6, LLC,
Appellant,

*v.*

WING ENTERPRISES, INC. AND ARTHUR WING,
Appellees.

Opinion
No. 20220977-CA
Filed August 1, 2024

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 180401660

Jefferson W. Gross, S. Ian Hiatt, and J. Adam
Sorenson, Attorneys for Appellant

Mark O. Morris, Cameron J. Cutler, and Benjamin J.
Mills, Attorneys for Appellees

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and RYAN D. TENNEY
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     S6, LLC (S6) is a consulting firm owned and managed by Mark Stromberg. For approximately three years, S6 provided consulting services to Wing Enterprises, Inc. (Wing). When Wing terminated the relationship with S6, S6 filed suit against Wing, asserting claims for breach of oral agreement, breach of implied-in-fact contract, unjust enrichment, and promissory estoppel. Following a series of pretrial motions, the district court dismissed all but S6's promissory estoppel claim. After a five-day trial, a jury returned a special verdict in favor of S6, which was subsequently vacated by the court.

¶2    S6 now appeals, arguing there were abundant errors that infected the judgment. Specifically, S6 takes issue with multiple rulings of the district court, including the court's decisions to dismiss all but S6's promissory estoppel claim, to exclude all evidence of S6's damages, to grant Wing's post-trial motion for judgment as a matter of law, and to award Wing costs. We affirm the district court in all respects.

BACKGROUND

¶3    In 2012, following his father's death, Arthur Wing became the chief executive officer of Wing, a closely held corporation that manufactures and distributes ladders. In early 2014, Arthur[1] was introduced to Hero Partners (Hero)—a business networking and consulting company—through Randy Hunt, who was Hero's vice president of business development. During the initial meeting, Hunt told Arthur about several upcoming events put on by Hero that he could attend, including a retreat in Montana the following month. Hunt also explained Hero's "15-15-15 Model" for the cost of its consulting services, whereby Hero would charge Wing a $15,000 monthly retainer fee, would receive 15% of Wing's stock, and would then have a 15% option on other stock in Wing.

¶4    In July 2014, Hero provided Wing with a proposed written agreement for consulting services (Hero Agreement). Per the terms of the Hero Agreement, Wing would pay Hero a $30,000 engagement fee to participate in the Montana retreat. The engagement fee would be used to cover the $15,000 monthly retainer fee for two months. Regarding equity, the Hero Agreement provided, "During the initial 90 days of this Agreement, the Parties shall arrive at a commitment wherein

---

1. Because Wing Enterprises, Inc. and Arthur Wing share the name Wing, we refer to Arthur by his first name for clarity, with no disrespect intended by the apparent informality.

[Wing] shall grant to [Hero] the right to purchase an ownership interest in [Wing] . . . ." Wing did not sign the Hero Agreement. It did, however, pay Hero the engagement fee.

¶5    The following week, Wing's executives attended the retreat in Montana. While at the retreat, they were introduced to Stromberg, whom Hero had hired to provide consulting services on Hero's behalf. Stromberg presented Wing with a "thorough overview" of his "strategic planning process" although he did not have "any financial information of Wing" at the time of that meeting. At the end of the retreat, Arthur remarked that Hero "should be charging . . . north of $40,000 a month" for its consulting services.

¶6    After the retreat, the parties continued discussions regarding the terms of the Hero Agreement. Wing's counsel proposed several changes, which Hunt accepted on Hero's behalf, and the document was returned to Wing to execute.[2] Wing never signed the amended Hero Agreement. Stromberg, however, was under the impression that the agreement had been executed, and in August 2014, Stromberg attended a "strategic planning kickoff" meeting with Wing's executives and began working on a strategic

---

2. The amended Hero Agreement provided that "the Parties will use their best efforts to arrive at a commitment wherein [Wing] shall grant to [Hero] the right to purchase an ownership interest in [Wing], a mutually agreed upon amount, not to exceed a fully diluted interest equal to 15% of the authorized and issued equity of [Wing]," and that "[u]nder no circumstances will failure by the Parties to come to a mutually agreeable valuation of [Wing] be considered bad faith or a failure to act in good faith on the part of a Party." Stromberg acknowledged that this was merely an "agreement to agree later," meaning that even if the document had been signed, "there was still a process that had to be pursued to come to a mutual agreement sometime in the future."

plan for Wing. Wing also began paying Hero the monthly $15,000 consulting retainer.

¶7      Stromberg continued to provide consulting services to Wing through Hero until March 2015. In April 2015, Stromberg and Hero mutually agreed to allow Stromberg to separate from Hero, and Hero assigned its consulting agreement with Wing to S6—Stromberg's company. Thereafter, Stromberg met with Wing and informed the company that he would no longer be working with Hero but that he could continue providing consulting services through S6 just as he had done through Hero. Wing agreed and began making payments directly to S6. For approximately the next three years, Wing paid S6 its $15,000 monthly retainer, and Stromberg provided consulting services to Wing through S6.

¶8      Following the transition from Hero to S6, Stromberg knew that "there was no enforceable agreement at the time for an equity interest." But Stromberg "anticipated" that a deal would be "put in writing," and he "frequently" met with Wing to propose different equity options. In July 2015, S6 proposed—based on the terms of the unsigned Hero Agreement—a 15% carried interest. Wing rejected this 15% proposal outright. The parties then continued to discuss other percentages, including 8% and 10%. Ultimately, the parties did not agree on any specific percentage.

¶9      In February 2016, Stromberg prepared a carried interest term sheet, which he sent to Wing. Wing did not respond to the term sheet, other than to acknowledge that it had been received. Despite having no written equity deal, Stromberg continued to work for Wing "based on trust" that an equity deal would get done.

¶10     In August 2016, Stromberg met with Arthur and other Wing executives to discuss Stromberg's latest equity proposal. Stromberg gave a lengthy presentation detailing "the [equity]

mechanics and the numbers, at least that [he] was proposing." Stromberg proposed a number of predetermined "gates" or "hurdles" that would have to be met in order for S6 to receive any equity in Wing. Although the Wing executives asked him multiple questions, Stromberg perceived "no push back" or "rejection" by Wing of the gates that Stromberg had proposed, which led Stromberg to conclude that "there was an agreement reached that [the proposal] looked reasonable." According to Stromberg, by the end of the meeting S6 and Wing had "agreed to a four percent equity" interest. Arthur instructed a Wing executive to set up a meeting with Wing's counsel to "have him begin drafting an agreement."

¶11    Stromberg met with Wing's counsel in January 2017. During this meeting, Stromberg gave "basically" the same presentation that he had given in August 2016. Stromberg testified that Wing's counsel expressed no concerns with any of the proposed gates and told Stromberg that he thought the proposal "looked reasonable." At the end of the meeting, Stromberg told Wing's counsel that "although [the parties] had agreed to the equity percent, four percent, . . . [Stromberg was] willing to work with [counsel] on reasonable hurdles." The next day, Stromberg sent Wing's counsel a follow-up email that stated, "Attached is the worksheet we took a look at yesterday. Anything in blue is variable so you can play with different scenarios." Among the "variables" were some of the gates that Stromberg had proposed.

¶12    Over the course of the following year, Stromberg was assured that an equity deal would get done. But in February 2018, Wing informed S6 that it was terminating the relationship and that S6 would not receive any equity in Wing. Wing agreed to pay S6 its monthly consulting fee through June to allow S6 to complete its outstanding projects.

¶13    In October 2018, S6 filed suit against both Wing and Arthur, asserting claims for breach of oral agreement, breach of implied-in-fact contract, unjust enrichment, and promissory estoppel. Arthur moved for summary judgment on all claims against him individually. After briefing and argument, the district court granted Arthur's motion, dismissing him from the case.

¶14    In September 2019, Wing moved for summary judgment on all claims against it. Regarding S6's equitable claims, Wing argued that (1) S6 could not establish an implied-in-fact contract because "S6 testified it had subjective and actual *knowledge* that no agreement on terms was reached" and "S6 [could] point to no conduct on the part of Wing that indicates it ever agreed to an equity interest"; (2) S6's unjust enrichment claim failed "for lack of damages" because "S6 [had] adduced no evidence to establish the value of any benefit it purportedly conferred on Wing"; and (3) promissory estoppel was not available to S6 because "consideration [was] exchanged," i.e., S6 received $15,000 per month from Wing in exchange for providing consulting services.

¶15    In December 2019, the district court entered a summary judgment order narrowing S6's breach of contract and implied-in-fact contract claims to a single factual scenario: that "the parties negotiated about how much equity S6 would get and the gates S6 must meet to obtain that equity" and "those negotiations culminated in an agreement on August 22, 2016 that [Wing] would grant S6 a 4% equity interest without any other conditions attaching to that grant." The court also dismissed S6's unjust enrichment claim, concluding that "S6 [had] not produced evidence of the amount of damages." However, the court denied summary judgment on S6's promissory estoppel claim, reasoning that "[a] partial payment of consideration does not bar relief under a theory of promissory estoppel."

¶16    Approximately one month later, Wing moved to exclude S6's valuation and damages expert (Expert), who had offered two

opinions. First, Expert had opined that Wing's fair market value had increased from $16 million in July 2014 to $70 million in December 2018. Second, Expert had opined that S6 suffered economic damages of $1.2 million over the course of its engagement with Wing by reducing its monthly consulting fee. The district court granted Wing's motion, concluding that Expert's fair market value opinion was inadmissible under rules 401, 402, and 403 of the Utah Rules of Evidence. The court also excluded Expert's economic damages opinion under rule 702 because the opinion did not "involve scientific, technical, or other specialized knowledge."

¶17   Due to the COVID-19 pandemic, the trial date was pushed back several times. Trial was ultimately set for October 2021.

¶18   On September 9, 2021, Wing moved to exclude any evidence of S6's damages based on S6's failure to "disclose an adequate damages computation for the 4% equity interest" pursuant to rule 26(a)(1)(C) of the Utah Rules of Civil Procedure. The district court granted Wing's motion in part, ruling that S6 had failed to disclose the value and method of computation of its alleged 4% equity interest and was therefore precluded under rule 26(d)(4) from presenting any "evidence of [S6's] damages related to its alleged 4% equity interest in Wing, whether characterized as expectation, consequential or otherwise." The court reached the opposite conclusion, however, with respect to S6's alleged reliance damages in regard to its promissory estoppel claim, finding that S6 was entitled to "introduce evidence of its properly disclosed reliance damages" of $1.2 million.

¶19   In October 2021, approximately one week before the jury trial was scheduled to begin, Wing moved to dismiss the remaining portion of S6's breach of contract and implied-in-fact contract claims in light of the district court's ruling barring S6 from presenting any evidence of damages to support these claims. The court dismissed the claims.

¶20 After another COVID-19-related continuance, the case finally went to trial in May 2022 on S6's remaining claim for promissory estoppel and Wing's related defenses. At the close of S6's case-in-chief, Wing moved for judgment as a matter of law pursuant to rule 50 of the Utah Rules of Civil Procedure. The district court declined to rule on Wing's motion at that time. Then, before closing arguments, Wing renewed its rule 50 motion and S6 moved for judgment as a matter of law on Wing's failure-to-mitigate defense. The court again declined to rule on the motions and instead submitted the case to the jury.

¶21 Following deliberations, the jury returned a special verdict in favor of S6 on each element of its promissory estoppel claim. However, the jury also found that S6 had failed to mitigate its damages in the amount of $510,000, rendering a net damages award of $600,000.

¶22 Thereafter, each side submitted a written post-trial motion that included, at the district court's request, supplemental briefing on the parties' respective rule 50 motions. After considering the briefing and holding oral argument, the court granted Wing's motion for judgment as a matter of law on S6's promissory estoppel claim and vacated the jury's verdict. The court found that S6's promissory estoppel claim failed as a matter of law because there was no evidence of a reasonably clear and definite promise:

> [T]here is no evidence in the record on which a reasonable jury could find that [Wing] made a reasonably certain and definite promise of equity to S6 . . . . Even though the parties agreed as to the amount of equity—four percent, the parties never agreed upon the gates S6 would need to pass in order to obtain that equity.

Having granted Wing's motion, the court dismissed as moot S6's post-trial motion for judgment as a matter of law or, alternatively,

to alter or amend the judgment on Wing's failure-to-mitigate defense. The court also concluded that Wing, as the prevailing party, was entitled to costs in the amount of $12,805.60.

ISSUES AND STANDARDS OF REVIEW

¶23   S6 now appeals, asserting the district court committed numerous errors—both pre- and post-trial—that affected the final judgment. First, S6 argues the court improperly dismissed its implied-in-fact contract and unjust enrichment claims prior to trial. As part of this argument, S6 challenges (A) the court's summary judgment rulings limiting S6's implied-in-fact contract claim and dismissing S6's unjust enrichment claim and (B) the court's exclusion of S6's damages evidence. "We review a district court's decision to grant summary judgment for correctness, granting no deference to the district court's conclusions, and we view the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Center*, 2010 UT 59, ¶ 6, 242 P.3d 762 (quotation simplified). Conversely, we review a district court's decision to exclude expert testimony deferentially, reversing the court's decision "to strike expert testimony only when it exceeds the limits of reasonability." *Id.* ¶ 5 (quotation simplified). A district court's decision to exclude evidence as a sanction under rule 26(d)(4) of the Utah Rules of Civil Procedure is likewise reviewed for abuse of discretion. *See Keystone Ins. Agency v. Inside Ins.*, 2019 UT 20, ¶ 12, 445 P.3d 434; *see also Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 35, 215 P.3d 933 ("We will determine that a district court has abused its discretion in choosing which sanction to impose only if there is either an erroneous conclusion of law or no evidentiary basis for the district court's ruling." (quotation simplified)).

¶24   Second, S6 contends the district court erred in granting Wing's post-trial motion for judgment as a matter of law on S6's

promissory estoppel claim. A district court may grant a motion for judgment as a matter of law "only if there is no basis in the evidence, including reasonable inferences which could be drawn therefrom, to support the jury's determination." *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 18, 309 P.3d 201 (quotation simplified). We review rulings on such motions for correctness. *See id.*[3]

¶25 Third, S6 contends the district court abused its discretion in awarding costs. "A trial court's decision to award the prevailing party its costs will be reviewed under an abuse of discretion standard." *Jensen v. Sawyers*, 2005 UT 81, ¶ 140, 130 P.3d 325 (quotation simplified).

## ANALYSIS

### I. The District Court Correctly Dismissed S6's Implied-in-Fact Contract and Unjust Enrichment Claims Prior to Trial

¶26 In its initial complaint, S6 asserted claims against Wing for breach of oral agreement, breach of implied-in-fact contract, unjust enrichment, and promissory estoppel. Through a series of orders, the district court dismissed S6's contract claims and unjust enrichment claim, leaving only the promissory estoppel claim for trial. On appeal, S6 argues the court erred in dismissing its

---

3. After granting Wing's motion for judgment as a matter of law, the district court concluded that S6's post-trial motion to alter or amend the judgment on Wing's failure-to-mitigate defense was moot. S6 notes that if this court reinstates the jury's verdict, then S6's post-trial motion is no longer moot. Because we conclude that the district court did not err in granting Wing judgment as a matter of law, the court's mootness determination is not implicated.

implied-in-fact contract and unjust enrichment claims.[4] S6's challenges can be grouped into two general categories: (A) challenges to the court's summary judgment rulings and (B) challenges to the court's rulings excluding S6's damages evidence.

## A.    Summary Judgment Rulings

¶27    Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). However, the "extent of the moving party's burden [to produce evidence] varies depending on who bears the burden of persuasion at trial." *Salo v. Tyler*, 2018 UT 7, ¶ 26, 417 P.3d 581. Where, as here, the nonmoving party will bear the burden at trial, "the moving party may carry its burden of persuasion [on summary judgment] without putting on any evidence of its own—by showing that the nonmoving party has no evidence to support an essential element of a claim." *Id.* ¶ 2. "Upon such a showing, . . . the burden then shifts to the nonmoving party, who may not rest upon the mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* ¶ 25 (quotation simplified).

¶28    Wing moved for summary judgment on each of S6's claims. The district court largely agreed with Wing's position, granting Wing partial summary judgment on S6's implied-in-fact contract claim and granting Wing summary judgment on S6's unjust enrichment claim. S6 argues the court erred in so ruling, asserting that there were genuine issues of material fact on both claims.

---

4. S6 does not challenge the district court's rulings concerning S6's claim for breach of oral agreement.

1.      Implied-in-Fact Contract Claim

¶29   On summary judgment, the district court narrowed S6's implied-in-fact contract claim, limiting that claim to a single factual scenario: that the parties negotiated about how much equity S6 would receive and "those negotiations culminated in an agreement to grant S6 a 4% equity interest without any requirement that gates be met." The court reasoned it was "undisputed that the parties never reached an agreement on what . . . gates" S6 was required to meet to obtain equity and the "gates [were] material terms." Thus, the court concluded that to the extent the equity was contingent on S6 meeting certain gates, the agreement was unenforceable for lack of sufficient definiteness. We agree.

¶30   "An implied-in-fact contract is established by conduct." *Wayment v. Schneider Auto. Group LLC*, 2019 UT App 19, ¶ 14, 438 P.3d 1005 (quotation simplified). "When mutual assent is based on conduct or performance, the law requires that words or actions of a party must be reasonably interpretable as indicating an intention to make a bargain with *certain terms or terms which reasonably may be made certain*." *Bergdorf v. Salmon Elec. Contractors Inc.*, 2019 UT App 128, ¶ 37, 447 P.3d 1265 (quotation simplified), *cert. denied*, 456 P.3d 389 (Utah 2019).

¶31   The district court did not err in narrowing S6's implied-in-fact contract claim because the gates were material terms and S6 has not pointed to any evidence demonstrating that the parties ever reached an agreement on what the gates would be. Indeed, as the court correctly ruled, the only evidence in the record is that "these terms could not reasonably be made certain."

¶32   Nevertheless, S6 contends that even if the district court was correct in concluding the gates were material terms, the "court ignored evidence . . . from which a jury could find a meeting of the minds, demonstrated by conduct." But S6's position on this

point is likewise not supported by record evidence. As S6 correctly notes, Stromberg met with Wing multiple times to discuss S6 receiving an equity piece of Wing as part of S6's compensation package. During these meetings, Stromberg "floated multiple percentages," and he and Wing "discuss[ed]" what gates would need to be cleared in order for S6 to be awarded equity. However, no evidence exists showing that the parties ever agreed as to any specific gate. Indeed, in January 2017, Stromberg met with Wing's counsel to draft a proposed equity agreement memorializing the terms Stromberg had presented to Arthur and other Wing executives during the August 2016 meeting. But one day after that meeting, Stromberg emailed Wing's counsel a copy of the proposal with the following instruction: "Attached is the worksheet we took a look at yesterday. Anything in blue is variable so *you can play with different scenarios*." (Emphasis added.) Included among those "variables" were the gates that Stromberg had proposed.[5] Therefore, even assuming that the parties did in fact agree on granting S6 equity subject to gates, Wing's conduct did not establish what those gates were, as evidenced by Stromberg's invitation to Wing's counsel to "play with" the proposed gates. Because "[t]here was simply no communication between [S6] and [Wing] that exhibits a meeting of the minds on any certain terms," *see id.* ¶ 38, the district court did not err in limiting S6's implied-in-fact contract claim on summary judgment.

---

5. Stromberg likewise testified at trial that at the end of the meeting with Wing's counsel, Stromberg told counsel that "although [the parties] had agreed to the equity percent, four percent, . . . [Stromberg was] willing to work with [counsel] on reasonable hurdles." Stromberg further explained that he "made sure [counsel] understood that he could play with [Stromberg's proposal] and maybe propose something [counsel] felt . . . needed to be . . . adjust[ed]."

2.      Unjust Enrichment Claim

¶33    The district court also dismissed S6's unjust enrichment claim on summary judgment on the ground that S6 had not "produced evidence of the amount of damages." Again, we discern no error in the court's ruling.

¶34    To recover on a claim for unjust enrichment, the plaintiff must establish three elements: "(1) The defendant received a benefit; (2) an appreciation or knowledge by the defendant of the benefit; (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it." *Emergency Physicians Integrated Care v. Salt Lake County*, 2007 UT 72, ¶ 11, 167 P.3d 1080 (quotation simplified). "The general measure of recovery for an unjust enrichment claim is the value of the benefit conferred on the defendant (the defendant's gain) and not the detriment incurred by the plaintiff." *Jones v. Mackey Price Thompson & Ostler*, 2015 UT 60, ¶ 57, 355 P.3d 1000 (quotation simplified). But where, as here, the defendant "has requested professional services, . . . the proper measure of the defendant's gain will normally be the reasonable value of the plaintiff's services." *Id.* ¶ 58. Expert testimony is required when the issue of damages is "not in the common knowledge and experience of the average person," *Warenski v. Advanced RV Supply*, 2011 UT App 197, ¶ 11, 257 P.3d 1096, *cert. denied*, 268 P.3d 192 (Utah 2011), or when "the jury would be unable to determine the [issue] without resorting to speculation," *Callister v. Snowbird Corp.*, 2014 UT App 243, ¶ 15, 337 P.3d 1044, *cert. denied*, 343 P.3d 708 (Utah 2015); *see also Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 54, 513 P.3d 729 (requiring expert testimony "where jurors cannot, without unjustifiable speculation, resolve a dispute based on the facts of the case and their own experiences").

¶35    Before the district court, S6 outlined two ways by which the court could measure damages. First, S6 claimed that the "value of the benefit conferred" on Wing was $54 million, which

was "the increase in the fair market value of Wing from $16 million to $70 million during the period S6 provided consulting services." Second, S6 claimed that the "reasonable value of its services" was "the difference between S6's reduced monthly charge of $15,000 and the $45,000 [that] S6 would have charged had it not been promised an equity interest in Wing." The court rejected both proposed damages calculations, finding that S6 had failed to produce evidence to support either measure. We agree.

¶36     Regarding the value of the benefit conferred, S6 provided a report prepared by Expert, wherein he opined "that the fair market value of total equity in Wing increased by $54 million between July of 2014 and December of 2018." However, Expert did not analyze how much of that purported increase was attributable to S6's consulting services. And this is of import here given the fact that the parties all agreed that Wing would have experienced organic growth independent of S6's services. Because of this, we agree with the court's conclusion that asking jurors to decide damages on this basis would be a "wildly speculative endeavor."

¶37     As to the reasonable value of S6's services, the sole basis for S6's claim that its services were worth more than the monthly $15,000 fee it had been charging was Stromberg's "self-serving and after-the-fact" statement that S6 would have charged more had it not been promised equity. But Stromberg's statement does not establish the reasonable value of S6's services, nor does it establish that S6's services were actually worth $45,000 per month. Accordingly, the district court was correct in determining that jurors asked to decide damages based on this evidence would be "engaged in a speculative endeavor."

¶38     S6 did not present sufficient evidence of the amount of damages to support its unjust enrichment claim. Therefore, the district court was correct in granting summary judgment to Wing on this claim.

B.      Damages Evidence Rulings

¶39     Following the district court's summary judgment rulings, Wing moved to exclude Expert. The court granted the motion. Then, shortly before trial, Wing moved to exclude all evidence of S6's contractual damages pursuant to rule 26(d)(4) of the Utah Rules of Civil Procedure. The court also granted this motion. S6 argues the court abused its discretion on both rulings.

1.      Exclusion of Expert

¶40     Expert prepared a report wherein he opined that over the course of S6's engagement, Wing's fair market value had increased from $16 million in July 2014 to $70 million in December 2018—a total increase of $54 million.[6] The district court excluded this opinion, concluding it was inadmissible under rules 401 and 402 of the Utah Rules of Evidence because "the two valuations that provided the basis for the opinion, a July 2014 valuation and a December 2018 valuation, are irrelevant and not sufficiently proximate in time to any of the potential dates of breaches of the contracts in question." In addition, the court concluded that even if the opinion was relevant, it was inadmissible under rule 403 because "the danger of unfair prejudice substantially outweighs the valuations' slight probative value." We discern no abuse of discretion in the court's decision to exclude Expert's opinion on either ground.

¶41     Under rule 402 of the Utah Rules of Evidence, only "[r]elevant evidence is admissible." Evidence is relevant if it bears

---

6. In this report, Expert also opined as to the amount of economic damages S6 had suffered by reducing its consulting fee. The district court excluded this opinion. Although S6 contends this was error, it does not challenge this exclusion on appeal because S6 was ultimately allowed to present evidence of these damages from other sources at trial.

on a fact "of consequence in determining the action." Utah R. Evid. 401(b). "Where evidence has no probative value to a fact at issue, it is irrelevant and is inadmissible under rule 402." *State v. Smedley*, 2003 UT App 79, ¶ 15, 67 P.3d 1005 (quotation simplified).

¶42 S6 sought to admit Expert's opinion as to the fair market value of Wing for the express purpose of establishing the "value of the benefit conferred" on Wing, which S6 was required to prove to succeed on its unjust enrichment claim. That claim, however, was properly dismissed on summary judgment. As a result, the alleged overall $54 million increase in Wing's fair market value was unrelated to any remaining claim. Therefore, the district court's decision to exclude Expert's opinion on this basis was well within its wide discretion.[7]

¶43 Notwithstanding the dismissal of its unjust enrichment claim, S6 contends the district court abused its discretion in excluding Expert's opinion because his opinion as to Wing's 2018 valuation was relevant to establish damages for S6's implied-in-fact contract claim.[8] But the court carefully explained why Expert's opinion regarding Wing's 2018 valuation was not

7. S6 takes issue with the district court's decision to exclude Expert's opinion on this basis primarily because S6 believes that the court incorrectly dismissed its unjust enrichment claim. Consequently, S6 contends that if we reinstate its unjust enrichment claim, we should also reverse the exclusion of Expert's opinion. Because we have determined the court correctly dismissed S6's unjust enrichment claim, we decline S6's invitation to reinstate Expert's opinion on this ground.

8. As noted, Expert also opined that Wing's valuation in 2014—a year prior to S6's engagement and some two years before the alleged breach—was $16 million. S6 has not argued on appeal that the court erred in excluding this valuation.

relevant to S6's implied-in-fact contract claim: "The measure of damages for breach of a contract to deliver stock is the value of the loss sustained or gain prevented *at the time . . . of the breach*." (Emphasis added.) Put differently, the proper valuation date for measuring S6's damages was the date of the alleged breach, which, according to Stromberg, occurred in August 2016 when Wing agreed to grant S6 a 4% equity interest but did not actually do so.[9] In light of the applicable August 2016 breach date, the court was well within its discretion to exclude Expert's opinion on the basis that the valuation of Wing in 2018—months after the end of S6's engagement and some two years after the alleged breach—was "irrelevant and not sufficiently proximate in time" to the date from which any damages should be measured.

¶44 Moreover, even if Expert's opinion had satisfied the relevancy requirements under rules 401 and 402, the district court

---

9. S6 challenges the district court's conclusion that August 2016 was the proper valuation date. S6 cites *Utah Department of Transportation v. Boggess-Draper Co.*, 2020 UT 35, 467 P.3d 840, for the propositions that "transactions removed in time from the valuation date may be probative of the market value on that date" and "sales of the same property at any reasonable time in the past or future [are] relevant evidence on the issue of present value." *Id.* ¶ 27 (quotation simplified). But that case is readily distinguishable. Critically, *Boggess-Draper Co.* is an eminent domain case concerning the value of real property. Here, not only was the market valuation at issue unrelated to real property, but the valuation was not based on an established sale price. And the fact of the sale was of import in *Boggess-Draper Co.*, where our supreme court expressly noted that "*sales* of the same property . . . when made under normal and fair conditions, are necessarily a better test of the market value than speculative opinions of witnesses." *Id.* (emphasis added) (quotation simplified). *Boggess-Draper Co.* is therefore inapposite, and we decline to apply it here.

did not abuse its discretion by excluding the opinion on the alternative ground that it did not pass the rule 403 balancing test. Under rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Utah R. Evid. 403. Evidence is unfairly prejudicial if it "creates an undue tendency to suggest decision on an improper basis." *Anderson-Wallace v. Rusk*, 2021 UT App 10, ¶ 23, 482 P.3d 822 (quotation simplified), *cert. denied*, 496 P.3d 716 (Utah 2021).

¶45 Here, the district court determined that any "probative value" of Expert's opinion was "light" given the substantial period of time between the 2018 valuation and the date of the alleged 2016 breach. Conversely, there was a "substantial likelihood" that the 2018 valuation would "confuse and mislead the jury." This determination does not "exceed[] the limits of reasonability." *State v. Chapman*, 2014 UT App 255, ¶ 16, 338 P.3d 230 (quotation simplified), *cert. denied*, 343 P.3d 708 (Utah 2015).

¶46 Given "the lack of proximity" between the 2018 valuation and August 2016, which was the proper date for measuring damages for the remaining implied-in-fact contract claim, we agree with the district court that the probative value of this valuation was low. In contrast, the danger of unfair prejudice was high. It is reasonable to conclude that admitting the 2018 valuation that lacked any bearing on the proper measure of damages would confuse and mislead the jury. Presenting the valuation to the jury would force jurors to wrestle with the import of Wing's valuation on a date far removed from the date of the alleged breach, to say nothing of the fact that at the time of the 2018 valuation, S6 was not even providing consulting services to Wing.

¶47 Based on the foregoing, the district court did not abuse its discretion when it excluded Expert's opinion.

2.        Exclusion of Contractual Damages Evidence

¶48     Prior to trial, the district court excluded "[a]ll evidence of [S6's] damages related to its alleged 4% equity interest in Wing, whether characterized as expectation, consequential or otherwise," as a sanction for S6's failure to fully comply with the disclosure requirements outlined in rule 26(a)(1)(C) of the Utah Rules of Civil Procedure. S6 takes issue with this ruling on two grounds. First, S6 contends the court erred in concluding its disclosure violated rule 26. Second, S6 contends that even if its disclosure was incomplete, the court abused its discretion in concluding that S6 had failed to establish good cause or harmlessness for its failure to disclose. We disagree with S6 on both fronts.

¶49     A party is required to include in its initial disclosures "a computation of any damages claimed and a copy of all discoverable documents or evidentiary material on which such computation is based." Utah R. Civ. P. 26(a)(1)(C). "In other words, both the fact of damages and the method for calculating the amount of damages must be apparent in the initial disclosures." *Black Diamond Fin. LLC v. Big Cottonwood Pine Tree Water Co.*, 2020 UT App 90, ¶ 20, 470 P.3d 445 (quotation simplified), *cert. denied*, 474 P.3d 948 (Utah 2020). When "a party fails to disclose or to supplement timely a disclosure . . . , that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure." Utah R. Civ. P. 26(d)(4).

¶50     In its original initial disclosures, S6 disclosed its damages as follows:

>       S6 has suffered significant monetary damages due to Wing's failure to grant S6 an equity interest. Although the value of such four-percent (4%) equity

> interests is currently undetermined[,] S6 believes
> the value of such interest is in excess of $5,000,000.

S6 later supplemented this disclosure. In the supplement, S6 disclosed two alternative ways by which it would calculate damages: (1) "the benefit conferred" on Wing from S6's services or (2) the difference in the monthly fee S6 would have charged Wing without the promise of equity. Notably, the supplemental disclosure did not provide additional information concerning the value of the 4% equity interest identified in the original disclosure; indeed, the supplement did not include *any* mention of the 4% equity interest. Based on S6's disclosures, the district court found that S6's damages computation was incomplete, reasoning that "[w]hile S6 disclosed a portion of its method [for calculating damages], i.e. 4% of the value of Wing, it disclosed neither the value nor the method of the value's computation. This failure made it impossible for Wing to know the amount of these damages claimed and to defend against it." This determination is legally sound.

¶51 S6 admitted below that its initial disclosure was inadequate, stating that "the method of calculating the value of [Wing] was not explained in that disclosure." Despite this acknowledgement, S6 defends its disclosure on two grounds. First, S6 contends that it *did* disclose the value of Wing through Expert, whom the district "court (incorrectly) excluded." Second, S6 contends that it "attempt[ed] to estimate the value of Wing in its initial disclosures, calculating the value of its 4% interest at approximately $5 million." Neither argument is availing.

¶52 As an initial matter, we have already determined that the district court's exclusion of Expert was proper because his valuation opinion failed to calculate Wing's value at the time of the alleged breach. *See supra* Part I.B.1. But aside from this fact, S6 cannot rely on a belated damages disclosure through an expert witness to cure its failure to serve an appropriate damages

disclosure prior to the close of fact discovery. *See Bodell Constr. Co. v. Robbins*, 2009 UT 52, ¶ 38, 215 P.3d 933 (rejecting a damages disclosure as insufficient where the plaintiff "disclosed its damages theories during fact discovery and then laid them out in greater detail in an expert report produced during the expert discovery period" (quotation simplified)); *see also Sleepy Holdings LLC v. Mountain West Title*, 2016 UT App 62, ¶ 14, 370 P.3d 963 ("If factual contentions about the amount of damages require further investigation or discovery, the party must undertake that investigation as early in the litigation process as is practicable." (quotation simplified)).

¶53    Moreover, S6's claim that it estimated the value of its interest in Wing as approximately $5 million mischaracterizes S6's disclosure and mistakes the requirements of rule 26. S6's disclosure is a self-avowed "undetermined" estimate of its alleged equity interest, which S6 believed to be "*in excess of* $5,000,000." (Emphasis added.) Thus, the plain language of the disclosure is far from certain, and it does not satisfy the standard for proving the fact of damages. *See Sleepy Holdings*, 2016 UT App 62, ¶ 13 (stating that the standard for determining the amount of damages requires "evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages" (quotation simplified)).

¶54    Because the district court was correct in its determination that S6 violated rule 26(a)(1)(C) when it failed to disclose "the value [and] the method of the value's computation," we next turn to the court's conclusion that S6's failure to disclose was not harmless or excused by good cause. "[T]he burden to demonstrate harmlessness or good cause is . . . on the party seeking relief from disclosure requirements." *Keystone Ins. Agency v. Inside Ins.*, 2019 UT 20, ¶ 18 n.7, 445 P.3d 434.

¶55    S6 contends that any failure to comply with rule 26 was both harmless and warranted by good cause. Regarding

harmlessness, S6 asserts that "Wing cannot be prejudiced by any failure on the part of S6 to disclose *the value of Wing itself*." But S6's argument is entirely speculative. There was no evidence that Wing, S6, or anyone else knew Wing's value at the relevant time—August 2016.[10] And even if Wing had known its own value in August 2016, this knowledge would not inform Wing of S6's alleged damages and method of computation. Wing's alleged ability "to guess at potential damages does not free [S6] from its obligations to disclose a computation of damages." *See Black Diamond Fin.*, 2020 UT App 90, ¶ 25 (quotation simplified); *see also RJW Media Inc. v. Heath*, 2017 UT App 34, ¶ 29, 392 P.3d 956 ("An insufficient disclosure by one party does not shift the burden and risk to resolve the insufficient disclosure to the other party . . . ."). The district court was therefore well within its discretion to conclude that S6 failed to meet its burden to establish that its failure was harmless to Wing.

¶56 Likewise, S6 cannot demonstrate the district court abused its discretion in concluding that S6 failed to meet its burden to establish that any failure to disclose was warranted by good cause. S6 again grounds this argument in the unproven assumption that Wing knew its own value; as such, it fails for the same reasons articulated above. Furthermore, S6 cannot show good cause for its failure where S6 acknowledged that its initial disclosure was insufficient yet it took no action to cure the insufficiency.

---

10. S6 posits that Wing was aware of its own value because Arthur testified during a deposition that he believed Wing's value to be $100 million. But Arthur's statement does not express an opinion of Wing's value as of August 2016. Indeed, Arthur's opinion as to the $100 million valuation was related to a third party's non-binding January 2019 letter of intent to purchase Wing and was couched strictly in terms of what Arthur believed Wing to be worth "[a]t the time" of the offer.

¶57    In short, the district court did not err in concluding that S6 failed to satisfy its initial disclosure obligation because the disclosure did not include a damages computation as required by rule 26(a)(1)(C). The court also acted within its discretion in excluding the disclosure as a sanction pursuant to rule 26(d)(4) because S6 did not carry its burden of demonstrating that the failure to disclose was harmless or warranted by good cause.

## II. The District Court Correctly Granted Wing's Motion for Judgment as a Matter of Law

¶58    Next, S6 argues the district court erred in granting Wing's motion for judgment as a matter of law on S6's promissory estoppel claim. The district court concluded Wing was entitled to judgment as a matter of law because the evidence adduced at trial was legally insufficient to establish that Wing made "a reasonably certain and definite promise" of equity to S6. In so ruling, S6 argues the court "misinterpreted Utah's promissory estoppel law, as well as the facts presented at trial."

¶59    Rule 50 of the Utah Rules of Civil Procedure permits a district court to grant judgment as a matter of law only where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on a claim or defense. Utah R. Civ. P. 50(a)(1). When considering a rule 50 motion, the "court must look at the evidence and all reasonable inferences in a light most favorable to the nonmoving party." *Franklin v. Stevenson*, 1999 UT 61, ¶ 6, 987 P.2d 22. We will affirm a judgment as a matter of law when a review of the evidence in a light most favorable to the non-moving party reveals that "there is no competent evidence that would support a verdict in the non-moving party's favor." *Gables at Sterling Village Homeowners Ass'n v. Castlewood-Sterling Village I, LLC*, 2018 UT 04, ¶ 21, 417 P.3d 95 (quotation simplified).

A.    Promissory Estoppel Requires a Reasonably Certain and Definite Promise

¶60    S6 argues the district court erred in concluding that promissory estoppel requires a "reasonably certain and definite promise." Relying on the definition of promissory estoppel contained in section 90 of the Restatement (Second) of Contracts, S6 contends that promissory estoppel may be established even where the promise does not contain all the usual elements, so long as the promise is reasonably certain and definite as to induce reliance. S6 misapprehends the law.

¶61    The Utah Supreme Court first cited the definition of promissory estoppel contained in section 90 in *Tolboe Construction Co. v. Staker Paving & Construction Co.*, 682 P.2d 843 (Utah 1984), a case raising a promissory estoppel claim in a situation involving a mistaken bid. Section 90 defines promissory estoppel as follows:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90 (Am. L. Inst. 1981). After quoting this definition, the *Tolboe* court articulated the elements of a promissory estoppel claim under Utah law. 682 P.2d at 845–46. It then analyzed the reasonableness of the plaintiff's reliance on the mistaken bid, finding that it was not sufficiently reasonable to support a claim for promissory estoppel. *Id.* at 846–48.

¶62    Four years later, in *Skanchy v. Calcados Ortope SA*, 952 P.2d 1071 (Utah 1998), the Utah Supreme Court again cited the definition of promissory estoppel contained in section 90 and

repeated the elements of a claim for promissory estoppel articulated in *Tolboe, see id.* at 1076–77. Those elements are as follows:

> (1) [T]he plaintiff acted with prudence and in reasonable reliance on a promise made by the defendant; (2) the defendant knew that the plaintiff had relied on the promise which the defendant should reasonably expect to induce action or forbearance on the part of the plaintiff or a third person; (3) the defendant was aware of all material facts; and (4) the plaintiff relied on the promise and the reliance resulted in a loss to the plaintiff.

*Id.* at 1077.

¶63 A decade later, the Utah Supreme Court again addressed promissory estoppel in the case of *Nunley v. Westates Casing Services, Inc.*, 1999 UT 100, 989 P.2d 1077. As in the instant case, *Nunley* involved a plaintiff seeking to enforce an alleged promise for stock in the defendant company. *See id.* ¶ 29. After identifying the previously established elements of a claim for promissory estoppel, the *Nunley* court analyzed what a plaintiff must show in order to prove reasonable reliance on a promise made by the defendant. It held that a "party claiming estoppel must present evidence showing that an offer or promise was made on which the party based his or her reliance" and that "the alleged promise must be reasonably certain and definite." *Id.* ¶ 36. Moreover, a "claimant's subjective understanding of the promissor's statements cannot, without more, support a promissory estoppel claim." *Id.* These requirements for establishing reasonable reliance have been consistently applied by Utah courts in subsequent cases. *See, e.g., Youngblood v. Auto-Owners Ins. Co.*, 2007 UT 28, ¶ 19, 158 P.3d 1088; *Volonte v. Domo, Inc.*, 2023 UT App 25, ¶ 49, 528 P.3d 327; *Lodge at Westgate Park City Resort & Spa Condo. Ass'n v. Westgate Resorts Ltd.*, 2019 UT App 36, ¶ 26, 440

P.3d 793; *Mitchell v. ReconTrust Co.*, 2016 UT App 88, ¶ 53, 373 P.3d 189, *cert. denied*, 387 P.3d 508 (Utah 2016).

¶64    S6 argues the district court erred in applying these requirements here because Utah courts have adopted a "flexible approach" to promissory estoppel. Under this flexible approach, S6 maintains, promissory estoppel may be established even where the promise is not certain or definite, so long as the promise is sufficient to induce reliance.

¶65    But S6's argument is not based on established Utah law. Rather, S6 relies on two cases from other jurisdictions (Iowa and Colorado) and the general notion that the definition contained in section 90 infused a more "flexible approach" to the doctrine of promissory estoppel. But the cases from Iowa and Colorado are neither controlling nor persuasive in the face of controlling Utah Supreme Court precedent to the contrary. And while the restatement serves an appropriate advisory role to courts in approaching unsettled areas of law, it does not supplant controlling precedent. *See Andreason v. Aetna Cas. & Surety Co.*, 848 P.2d 171, 175 (Utah Ct. App. 1993) (recognizing that section 90 has been adopted as "useful *guidance*" (emphasis added)); *see also Young H2ORE LLC v. J&M Transmission LLC*, 2024 UT App 10, ¶ 36, 543 P.3d 1264 ("Our supreme court has observed that . . . restatements are *persuasive authority*[] that serve an appropriate advisory role to courts in approaching unsettled areas of law." (emphasis added) (quotation simplified)); *Grundberg v. Upjohn Co.*, 813 P.2d 89, 95 (Utah 1991) (stating that the restatement "is not binding on our decision . . . except insofar as we explicitly adopt its various doctrinal principles"). And it certainly does not allow Utah courts to disregard explicit requirements articulated by our supreme court in the very same case in which the court had only generally recognized the definition contained in section 90. We accordingly agree with the district court that "the doctrine of promissory estoppel as applied in Utah requires a reasonably certain and definite promise."

B.     Wing Never Made a Reasonably Certain and Definite Promise of Equity

¶66     With the correct legal standard in mind, we now turn to the district court's conclusion that there was "no evidence in the record on which a reasonable jury could find that [Wing] made a reasonably certain and definite promise of equity to S6."

¶67     S6 contends the district court's ruling was in error because S6 presented facts at trial that provided a "legally sufficient evidentiary basis" for the jury to find in favor of S6. Those facts include the following:

- From the outset of the engagement when the Hero "15-15-15 Model" was discussed, Wing knew, understood, and promised that equity would be part of the deal.

- The Hero Agreement itself constituted a promise of equity. That agreement, which Wing accepted by paying the initial $15,000 fee, provided that the parties would arrive at a commitment whereby Wing would grant the right to purchase up to 15% of the outstanding stock.

- Throughout the engagement and based on Wing's promises of equity, S6 presented various proposals. In response to those proposals, Wing continually reassured S6 that an equity deal would get done.

- In August 2016, Stromberg met with Wing's representatives to make an equity proposal. Wing's representatives agreed that the proposal looked reasonable, agreed to a 4% equity, and instructed one of Wing's executives to set up a meeting with Wing's counsel to memorialize the terms. Thereafter, Wing's counsel agreed that the proposal looked reasonable.

¶68 Even viewing the evidence in the light most favorable to S6 and drawing all reasonable inferences in S6's favor, we do not agree with S6 that these facts establish that Wing made a reasonably certain and definite promise of equity. Although the parties eventually agreed as to the amount of equity—4%—the parties never agreed upon the "gates" that S6 would need to pass in order to obtain that equity. *See Nunley v. Westates Casing Services, Inc.*, 1999 UT 100, ¶ 41, 989 P.2d 1077 (rejecting the plaintiff's promissory estoppel argument because "the parties failed to come to terms on how, when, and on what terms" the plaintiff could obtain the promised equity interest). Indeed, in the words of Stromberg himself, "It was agreed that we'd get 4 percent, but *we needed to negotiate what the basis was going to be*, which means how much organic growth we did not get—that needed to be built in, and then also what the hurdles were that we needed to clear." (Emphasis added.)

¶69 Moreover, standing alone, Stromberg's subjective belief that an equity deal would get done is not sufficient to support a promissory estoppel claim. *See id.* ¶ 36. That Stromberg faced no pushback or disagreement after presenting his proposals does not equate to a clear and definite promise from Wing to grant equity along the terms identified by Stromberg. As just noted, Stromberg had to admit at trial that the gates were never agreed upon.

¶70 In sum, there is no dispute that Wing's satisfaction of never-defined gates was a prerequisite to S6 obtaining an equity interest in Wing and that S6 and Wing never determined or agreed upon a specific set of gates. Because these gates were never agreed to, Wing, as a matter of law, did not make a promise of equity to S6 that was sufficiently clear and definite to be actionable on a theory of promissory estoppel. The district court thus correctly granted Wing's motion for judgment as a matter of law.

III. The District Court's Award of Costs Was Proper

¶71    As a final matter, S6 argues the district court's award of costs was improper because the award included expenses that are not taxable as costs under rule 54(d) of the Utah Rules of Civil Procedure.[11] Specifically, S6 challenges the court's award of (1) service costs, (2) certain deposition costs, and (3) costs for pretrial and trial transcripts.

¶72    Rule 54(d)(1) provides that "costs should be allowed to the prevailing party." Utah R. Civ. P. 54(d)(1). "Utah courts have consistently made a distinction between legitimate and taxable costs and other expenses of litigation . . . ." *Stevensen 3rd East, LC v. Watts*, 2009 UT App 137, ¶ 62, 210 P.3d 977 (quotation simplified). "Costs are recoverable; litigation expenses, while seemingly necessary, are not." *Stevenett v. Wal-Mart Stores, Inc.*, 1999 UT App 80, ¶ 35, 977 P.2d 508.

¶73    Although rule 54(d)(1) does not define the term "costs," our supreme court has defined costs to mean "those fees which are required to be paid to the court and to witnesses, and for which the statutes authorize to be included in the judgment." *Frampton v. Wilson*, 605 P.2d 771, 774 (Utah 1980). "Thus, witness fees, travel expenses, and service of process expenses are chargeable as costs but only in accordance with the fee schedule set by statute." *Stevensen*, 2009 UT App 137, ¶ 63 (quotation

---

11. After granting Wing's motion for judgment as a matter of law, the district court determined that Wing had "prevailed on all claims" and was therefore the "prevailing party." *See R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119 (discussing the standard for determining the prevailing party). S6 argues that if we reverse any of the court's decisions challenged above then we must also vacate the court's prevailing party determination. Because we have affirmed each of the court's rulings, we have no occasion to reconsider the court's prevailing party determination.

simplified). Deposition costs are also recoverable "as long as the [district] court is persuaded that the depositions were taken in good faith and, in the light of the circumstances, appeared to be essential for the development and presentation of the case." *Id.* ¶ 65 (quotation simplified).

¶74 We conclude that the district court did not abuse its discretion in awarding Wing service costs. *See id.* ¶ 67 (upholding a "service of process fees" award); c*f. Frampton*, 605 P.2d at 772–74 (reversing an award for service cost where the cost "exceed[ed] [that] allowed by statute").

¶75 Likewise, the district court's award of deposition costs was proper. The court evaluated each of the complained-of depositions and concluded that they were taken in good faith and were essential to the case. S6 has pointed to nothing that would indicate this determination is "so unreasonable as to manifest a clear abuse of discretion." *See Ames v. Maas*, 846 P.2d 468, 476 (Utah Ct. App. 1993) (quotation simplified). As a result, we will not disturb it.

¶76 Lastly, we affirm the district court's award of costs for pretrial and trial transcripts. Wing requested transcripts for certain proceedings wherein the court ruled on motions in limine as well as a transcript for four days of the jury trial. The court evaluated Wing's request and concluded that an award of costs for these transcripts was warranted because the hearings for "[t]he motions in limine were important hearings that affected the parties' strategies and decisions for trial" and "[t]he trial transcript was . . . important in light of the parties' competing motions for judgment as a matter of law." Because the Utah Code provides that transcripts may be properly taxed as costs, *see* Utah Code § 78A-2-410 ("A transcript may not be taxed as costs, unless the preparation of the transcript is ordered either by a party or by the court."), we discern no abuse in the court's decision to award Wing its requested costs for transcripts.

CONCLUSION

¶77   The district court did not err in dismissing S6's implied-in-fact contract and unjust enrichment claims prior to trial. The court acted well within its broad discretion in both excluding Expert's opinion and in excluding S6's damages evidence as a sanction for S6's failure to comply with the disclosure requirements outlined in rule 26 of the Utah Rules of Civil Procedure. The court was also correct in granting Wing's post-trial motion for judgment as a matter of law and vacating the jury's verdict that found Wing liable for promissory estoppel. The court's award of costs was likewise proper.

¶78   Affirmed.